**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MICHAEL F. SALVANA, M.D.,

                              Plaintiff,                    5:21-cv-00735 (BKS/ML)

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY SUPERVISION,
CARL KOENIGSMANN, M.D., JOHN MORLEY, M.D.,
DAVID S. DINELLO, M.D., PATRICIA HENDERSON,
R.N., BETTY M. PARKMOND, R.N.,

                              Defendants.

---

**Appearances:**

*For Plaintiff:*
Carlo Alexandre C. de Oliveira
Cooper Erving & Savage LLP
39 North Pearl St., 4th Fl.
Albany, NY 12207

Richard Condit
Desiree Langley
Mehri & Skalet, PLLC
2000 K Street, NW, Suite 325
Washington, DC 20006

*For Defendants:*
Letitia James
New York State Attorney General
Jorge A. Rodriguez
Assistant Attorney General, Of Counsel
The Capitol
Albany, NY 12224

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.      INTRODUCTION

Plaintiff Michael F. Salvana, M.D., a former Clinical Physician and Facility Health Services Director with the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action against DOCCS as well as former DOCCS Deputy Commissioner and Chief Medical Officer Carl Koenigsmann,[1] M.D.; current DOCCS Deputy Commissioner and Chief Medical Officer John Morley, M.D.; Regional Medical Director for Elmira and Oneida "HUBS" David S. Dinello, M.D.; DOCCS Deputy Superintendent for Health Services Patricia Henderson, R.N.; and DOCCS Nurse Director Betty M. Parkmond, R.N. (Dkt. No. 1, ¶¶ 8, 15–22, 31). Plaintiff raises a First Amendment retaliation claim and a Fourteenth Amendment Equal Protection claim under 42 U.S.C. § 1983, as well as claims for retaliation in violation of New York Labor Law § 741 and New York Civil Service Law § 75-b. (Dkt. No. 1, ¶¶ 158–93). Defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim, (Dkt. No. 22), and Plaintiff opposes the motion, (Dkt. No. 24). For the reasons set forth below, Defendants' motion to dismiss is granted in part and denied in part.

## II.     FACTS[2]

### A.      Plaintiff's Role at DOCCS

DOCCS is the "New York State agency responsible for operating correctional facilities within" the state and is "responsible for the medical care of all inmates in its custody." (Dkt. No.

---

[1] Although Plaintiff sometimes refers to Defendant "Koeningsmann," (Dkt. No. 1, ¶¶ 108, 109, 113, 114, 116, 117), he is named in the caption and elsewhere as "Koenigsmann" (*id.* ¶¶ 15, 65, 67, 78, 80, 82).

[2] The facts are drawn from Plaintiff's complaint. (Dkt. No. 1). The Court assumes the truth of all well-pleaded facts and draws all reasonable inferences in Plaintiff's favor. *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011).

1, ¶ 8). DOCCS is an accredited member of the American Correctional Association and the

National Commission on Correctional Health Care, both of which have "health care standards to

which they adhere." (*Id.* ¶¶ 9–10). DOCCS also "adheres to prison health care standards

published by the American Public Health Association." (*Id.* ¶ 11). However, prison hospitals in

New York State "are not overseen and regulated by the New York State Department of Health,"

except as to treatment of certain infectious diseases. (*Id.* ¶¶ 12–13). Thus, "[p]rison health care

workers are accountable only to DOCCS medical administration, which effectively creates its

own rules." (*Id.* ¶ 14).

At DOCCS, there are five Regional Medical Directors ("RMDs") and five Regional

Superintendents for Health Services ("Superintendents") who "oversee care in their designated

areas" and report to the DOCCS Deputy Commissioner or Chief Medical Officer. (*Id.* ¶ 20).

Each DOCCS prison also has a Facility Health Services Director ("Facility Director"), who

"serves as the prison's highest medical authority." (*Id.* ¶ 21). Facility Directors "report directly"

to Superintendents and "indirectly" to RMDs. (*Id.*).

Plaintiff began working as the Facility Health Services Director—Clinical Physician III

at Walsh Regional Medical Unit ("RMU") in 2014.[3] (*Id.* ¶ 31). Walsh RMU is a DOCCS

medical facility within the Mohawk Correctional Facility with "approximately 152 beds for the

most complicated and difficult cases . . . in the New York State correctional system." (*Id.* ¶ 33).

Each patient at Walsh RMU is assigned a medical team comprised of a clinician, nurses, and

other appropriate staff, who make decisions regarding the patient's treatment and care,

"including medication decisions." (*Id.* ¶ 34). As Facility Director, Plaintiff was "responsible for

---

[3] Plaintiff previously worked for DOCCS as a part-time physician at Mid-State Correctional Facility from 2003 to 2005, and at Walsh Regional Medical Unit as a "clinical physician II" from 2005 to 2011. (Dkt. No. 1, ¶¶ 28–29). He left DOCCS in 2011 due to the closure of Oneida Correctional Facility, and returned to Walsh RMU in 2014. (*Id.* ¶¶ 29–31).

overseeing all medical staff including doctors, nurse practitioners, nurses, physical and occupational therapists, radiology technicians, and the pharmacy supervisor," and he "supervis[ed] the treatment of 152 patients at Walsh RMU who had extreme medical pathology, some of whose medical histories exceeded 1,000 pages." (*Id.* ¶¶ 35, 100). Plaintiff and the physicians and nurses he supervised were "responsible for evaluating and performing scheduled examinations" of patients, referring patients outside for specialized treatment, and "prescribing, modifying, or declining the specialist-recommended medications." (*Id.* ¶¶ 36–37). "[P]rison physicians, such as [Plaintiff]" make decisions as to the "proper medical treatment [of] inmates," and "prescribe, modify, or decline medication based on their medical judgment and individualized assessment of the patients." (*Id.* ¶ 38). Moreover, as a physician, Plaintiff was "[g]uided by his *Hippocratic Oath* 'to do good or to do no harm,'" and had an "ethical responsibility not to discriminate against patients on the basis of personal or social characteristics relevant to their care, which includes incarceration status." (*Id.* ¶¶ 26–27).

### B.   The MWAP Policy

DOCCS physicians may prescribe medications listed in the DOCCS "Formulary Book" without approval from an RMD. (*Id.* ¶¶ 39–40, 42). To prescribe a medication not listed in the Formulary Book, physicians must submit a Non-Formulary Request to an RMD for approval. (*Id.* ¶ 40).

Defendant Dinello, as an RMD and Chairman of the DOCCS Pharmacy and Therapeutic Committee, was "empowered to institute policies and procedures and oversaw primary care guidelines for the medical providers of almost 50,000 patients." (*Id.* ¶ 64).[4] Defendant

---

[4] Plaintiff alleges that DOCCS gave Dinello these roles despite his lack of specialized training in addiction issues, and his guilty plea following charges in 2010 by the New York State Department of Health State Board of Professional Medical Conduct of "failing to adequately evaluate patients prior to discharge from an emergency room." (*See* Dkt. No. 1, ¶¶ 56–64).

Koenigsmann, who was then the DOCCS Deputy Commissioner and Chief Medical Officer, authorized Dinello to draft a new policy on Medications With Abuse Potential ("MWAPs"). (*Id.* ¶ 65). Dinello wrote a rough form of the policy in 2015, which Koenigsmann promulgated on June 2, 2017. (*Id.* ¶ 66). Koenigsmann then signed a revised version of the MWAP Policy on September 10, 2018. (*Id.* ¶ 67).

The MWAP policy placed certain medications—including medications that were previously listed in the Formulary Book—on the "MWAP list." (*Id.* ¶¶ 43, 45). This list included medications such as Ultram, Percocet, Oxycodone, Neurontin, Lyrica, and Baclofen, Flexeril, and Loperamide (commonly known as Imodium), the use of which may "engender some risk," but which DOCCS physicians had prescribed as appropriate despite awareness of the risk for decades. (*Id.* ¶¶ 46–53). If an RMD or prison physician is concerned about "diversion or misuse" of these medications, the clinician may have the patient monitored or request blood testing. (*Id.* ¶ 54). Plaintiff alleges that "all medications prescribed to patients in DOCCS' custody are administered by medical professionals and, thus, unlikely to be abused [and] are the only effective medication available for certain health conditions." (*Id.* ¶ 55).

Nonetheless, under the MWAP policy, providers had to "submit a one-page MWAP request form" to the RMD in charge of their "hub" to "get approval" to prescribe a medication on the MWAP list. (*Id.* ¶¶ 68–69). The Request Form asked for the patient's relevant health information, the "justification" for the use of the medication, a list of "alternatives" tried to treat the medical issue, and whether there was "any recent evidence of drug diversion or abuse by the patient." (*Id.* ¶¶ 70–71). When processing MWAP Request Forms, the RMDs only had access to "limited portions" of the patient's medical history from the Facility Health Services Database; from this Database, RMDs could not look up the patient's "daily treatment records" which were

"held with their primary provider," or their paper Ambulatory Health Record, which was kept at the facility where the patient was held. (*Id.* ¶¶ 72–74). The RMD then determined whether the patient received the MWAP medication; clinicians had "no ability to provide the medication once an RMD [had refused] to approve the prescription," and pharmacies would not fill MWAP prescriptions without RMD approval. (*Id.* ¶¶ 75–77).

Plaintiff alleges that Koenigsmann has testified elsewhere that the RMDs felt strongly that the MWAP policy needed to be a "policy" as opposed to a "practice guideline" because "[a] policy requires adherence." (*Id.* ¶ 78). In an internal DOCCS email, Koenigsmann wrote to Dinello that they needed to be "extremely careful about indicating that anyone [was] having their medication discontinued because of a new policy," as changing medications based on a policy would be "doomed to [legal] failure." (*Id.* ¶¶ 80–81). He also noted that he held reservations about creating a guideline versus a policy because "it's difficult with licensed clinicians to dictate how they provide care," but under the MWAP policy, "we do require that they have to prove certain things before they're able to prescribe these medications, and that's different from out in the free world" where there are "no similar limitations on providers." (*Id.* ¶ 81). He added that the MWAP policy was "never designed to eliminate any specific" medication or class of medications, but only to "ensure that we have proper oversight over the clinicians ordering the medications." (*Id.* ¶ 82).

However, the MWAP policy "had the immediate impact of abruptly discontinuing the effective treatment of hundreds of inmates that need[ed] MWAPs, including patients who suffer[ed] from epileptic seizures, Multiple Sclerosis, cancer, sickle-cell anemia crisis, phantom pain, major spinal injuries, and other sources of chronic pain." (*Id.* ¶ 83). Plaintiff alleges that medical records show "consistent patterns of medical providers fighting the RMDs when their

6

patients [were] denied recommended and effective MWAP medications." (*Id.* ¶ 84). On December 26, 2017, Dinello gave an "informal warning" to clinicians that a "formal warning" would be issued if the MWAP policy "was not followed." (*Id.* ¶ 85). Following the promulgation of the MWAP policy on June 2, 2017, RMDs "repeatedly and systematically refused the prescription or re-prescription of MWAPs to patients in desperate need of medications to effectively treat chronic pain and nerve issues," without regard for the recommendations of treating providers or the patient's medical needs. (*Id.* ¶ 86).

Plaintiff alleges that "[a]s implemented, the MWAP policy [was] an almost wholesale restriction on the prescription of MWAPs," and that such a ban on medications "does not comport with the standards adopted by other prison systems or the Standard of Medical Care in the community." (*Id.* ¶ 87). According to Plaintiff, incarcerated patients have higher-than-average prevalence of disease, substance use disorders and psychiatric illness, and major spinal cord injuries, and treatment protocols are "necessarily different" in prisons because non-medical treatments may not be readily available. (*Id.* ¶¶ 94–96). Therefore, "pharmaceuticals . . . may take on an even greater therapeutic importance in prisons." (*Id.* ¶ 97).

### C.     Opposition to the Policy

After the enactment of the MWAP policy, "many patients were denied medications that effectively treated their serious pathologies and had been previously prescribed by their treating doctor." (*Id.* ¶ 102). Medical providers at Mohawk Correctional Facility and Walsh RMU "who were similarly situated to [] Plaintiff opposed the MWAP policy and challenged decisions made under the policy that adversely impacted their patients"; for example, the Mohawk Clinic Director "expressed concerns on a number of occasions," "frequently contested the application of the MWAP policy to medications that he deemed appropriate for his patients," and "attended meetings with Plaintiff and DOCCS managers to discuss the MWAP policy." (*Id.* ¶¶ 103–104).

Doctors and nurse practitioners who worked with Plaintiff at Walsh RMU also "contested application of the MWAP policy to their patients," "attended meetings concerning the policy," and "otherwise complained about the policy." (*Id.* ¶ 105). However, neither the Mohawk Clinic Director nor the other doctors or providers working at Walsh RMU "were subjected to the intensity of harassment, hostility, and abuse" that Plaintiff suffered; Plaintiff alleges that he was "singled out and intentionally and maliciously treated differently than the other medical providers." (*Id.* ¶ 106). Nonetheless, Plaintiff "challenged the Defendants in an effort to protect the rights of Walsh RMU patients." (*Id.* ¶ 107).

Plaintiff opposed the MWAP Policy "from its inception because it prevented him and other doctors from providing the proper quality of care to inmates under DOCCS custody." (*Id.* ¶ 99). On or around July 7, 2017, Plaintiff wrote an email to Koenigsmann, "expressing his concerns that enforcing the MWAP policy would likely result in litigation and ethical complaints to the Board of Medical Examiners," and asking that patients at Walsh RMU be "exempted." (*Id.* ¶ 108). Koenigsmann "concurred" with his concerns but denied his request that patients at Walsh RMU be exempt. (*Id.* ¶ 109).

In July 2017, Plaintiff "sent a letter to Mohawk Correctional Facility Superintendent Paul Gonyea outlining his concerns with the implementation of the MWAP policy." (*Id.* ¶ 110). Plaintiff wrote that the policy "interfered with proper patient care, caused patients to undergo needless tests and consultations, and created a potential for liability due to the resulting poor patient care." (*Id.*). On or around July 28, 2017, Gonyea forwarded the letter to Associate Commissioner and Executive Assistant Charles F. Kelly, Jr. and to then-Acting Commissioner Anthony J. Annucci "asking that [Plaintiff's] concerns be brought to the Commissioner's attention." (*Id.* ¶ 111).

On or around August 9, 2017, Dinello, Defendant Henderson, Statewide Director of Pharmacy Services Mary E. Koury, R.Ph, and Plaintiff met to "discuss [Plaintiff's] concerns with the MWAP policy." (*Id.* ¶ 112). During the meeting, the following concerns "were raised":

> a. the policy undermined the professional judgment of doctors already treating inmates and who were familiar with the inmates' medical history and recommended treatments;
>
> b. the policy created a potential for litigation because it denied necessary medication to patients after it had been recommended and approved by other medical specialists;
>
> c. [n]urses and pharmacists were concerned with the lag of time between MWAP approval and when medication could be administered due to the additional paperwork required by the MWAP policy;
>
> d. the MWAP policy was not appropriate for [] treating the chronically ill patients at Regional Medical Units because it allowed for the denial of necessary medication that had already been previously approved for the patients[; and]
>
> e. [d]octors were refusing to comply with the MWAP at the various RMUs due to concerns that it violated their ethical obligations to their patients and that it constituted improper patient care.

(*Id.*). Between August and November, Plaintiff wrote to Koenigsmann that the "MWAP policy at Mohawk Correctional Facility and Walsh RMU continued to create significant problems in the management of patients and in administering proper community standards of care," specifically that "necessary medication was denied to patients even after additional information about the need for medication was provided by neurologists and oncologists." (*Id.* ¶ 114). Plaintiff wrote that the policy was "resulting in unnecessary patient suffering," providing specific examples of patients who were denied MWAP medications: (1) Dinello denied Neurontin to a patient with neuropathy, and told a Nurse Practitioner to use Cymbalta, which did not work; (2) Gabapentin was denied to a patient with spinal fusion; (3) Dinello denied Neurontin to a patient with

epilepsy, who had two episodes of seizures while being weaned off the medication, resulting in ER visits; (4) Plaintiff's requests for Morphine and Neurontin for a patient with necrosis, neuropathy, joint disease, and sickle cell anemia were denied, and the patient "came close to death" due to complications from a sickle cell crisis, yet Dinello "continued to state [that] . . . they are getting away from using opioids on [sickle cell] patients"; (5) Morphine and Percocet were denied to a patient with severe spinal stenosis and headaches post-pituitary adenoma resection; (6) Clonazepam was denied to a paraplegic patient with episodes of "severe Myoclonus," which "continues"; and (7) Percocet was denied to a wheel-chair-bound patient with HIV and degenerative disc disease. (*Id.* ¶ 115).

On November 1, 2017, Plaintiff, Koenigsmann, and Dinello met to discuss Plaintiff's concerns with the MWAP policy. (*Id.* ¶ 116). At this meeting, Plaintiff "discussed how the MWAP policy was preventing him from providing standard medical care to a number of chronically ill patients." (*Id.*). On January 18, 2018, Plaintiff "discussed his ongoing concerns with the MWAP policy" on a phone call with Koenigsmann and Dinello. (*Id.* ¶ 117). Nonetheless, "Defendants continued to enforce the MWAP policy and to deny necessary medication to numerous patients with painful pathologies and severe neurologic sequelae." (*Id.* ¶ 118).

In January 2018, Henderson was "appointed Deputy Superintendent for Health Services and became [Plaintiff's] immediate supervisor." (*Id.* ¶ 119). Soon thereafter, "numerous patients" filed complaints with DOCCS' Commissioner and took legal action against DOCCS relating to the MWAP policy. (*Id.* ¶ 120).

In June 2019, a patient suffering from apparent malignant sarcoma in his brain, which can cause irrational and delusional behavior, began exposing himself to nursing staff, pulled a

showerhead out of the wall, and broke a water pipe. (*Id.* ¶ 121). The Correctional Emergency Team was summoned to restrain him, and Plaintiff ordered an MWAP medication to sedate him and prevent injuries to staff or the patient. (*Id.*). Henderson, who is not a physician, opposed the emergency use of this MWAP medication, and ordered the responding nurse not to administer it. (*Id.*). Shortly thereafter, the patient broke through the metal reinforced plexiglass window of a holding room with his fist and attacked a correctional officer, causing permanent injuries. (*Id.*). The next day, Plaintiff emailed Dinello and Defendant Morley regarding Henderson's "decision to cancel [his] prescribed treatment." (*Id.* ¶ 122). Henderson then "locked [Plaintiff] out of the facility, demanding that he go to her office, where she berated him for prescribing a[n] MWAP medication and then filing a complaint about her." (*Id.*).

In mid-2019, Henderson and Defendant Parkmond "ordered nurses to withhold assistance from [Plaintiff] for several patients" "as a result of [his] continued opposition to the MWAP policy." (*Id.* ¶ 123). For example, Henderson did not allow a patient with hemophilia to self-administer his medication. (*Id.* ¶ 125). Plaintiff ordered that the patient be permitted to self-administer his medication, which he had been allowed to do, and when Henderson found out, she ordered the nurses to "stop assisting [Plaintiff] to treat this patient." (*Id.* ¶¶ 124, 126–27).[5] Plaintiff requested approval to prescribe Marinol to a quadriplegic patient with gastro-esophageal reflux, who often vomited while lying on his back making him "susceptible to aspiration, choking, and asphyxiation." (*Id.* ¶¶ 129–31). On multiple occasions, Plaintiff had sent this patient to the hospital for dehydration due to vomiting, and Marinol was the "only medication that controlled" it. (*Id.* ¶¶ 130–31). Dinello denied his request. (*Id.* ¶ 131). Fearing that without medication to control his vomiting the patient would need immediate medical assistance if he

---

[5] Plaintiff documented this incident in a September 30, 2019 letter to Morley. (*Id.* ¶ 128).

began to vomit and choke, Plaintiff asked that the patient's room be unlocked. (*Id.* ¶ 132).

Dinello and Henderson denied that request, and Henderson prohibited Plaintiff from treating the

patient and ordered correctional officers to prohibit Plaintiff from entering the patient's room.

(*Id.* ¶¶ 132–33). Henderson also ordered nurses to give a patient with multiple sclerosis only one

catheter, which would need to be washed before re-insertion. (*Id.* ¶¶ 134–35). Plaintiff had

written an order that the patient should have at least six catheters available to him each day,

because re-using catheters creates an increased risk of infection and is not consistent with

standard medical care. (*Id.* ¶¶ 135–36). Henderson ignored this order and directed nurses to only

give the patient one catheter, "disregard[ing]" Plaintiff's "recommended treatment." (*Id.* ¶¶ 134–

35, 137).

Henderson and Dinello "continued to deny [Plaintiff's] request[s] for medication for his

patients and to cancel prescriptions he ordered to treat chronically ill patients." (*Id.* ¶ 138). On

"numerous occasions," including in or around July 2019, Henderson called Plaintiff into her

office to tell him to stop writing letters to the DOCCS Commissioner and Chief Medical Officer

about the MWAP policy and other concerns. (*Id.* ¶ 139).

### D.    Plaintiff's Departure from Walsh RMU

Since the implementation of the MWAP policy, Plaintiff "struggled to insure [sic]

medically necessary care for many critically ill patients," and on "many occasions," his treatment

plans, and those of other doctors that served with him, were "materially interfered with or denied

by the Defendants." (*Id.* ¶ 140). He observed "unnecessary suffering and inhumane treatment,"

his efforts to improve quality of care for patients were "attacked," and he was subject to

"constant hostility and anger." (*Id.*).

Plaintiff felt that his working conditions had become "intolerable." (*Id.*). In late

September 2019, Plaintiff asked Dinello about transferring to Five Points Correctional Facility.

(*Id.* ¶ 141). However, when he learned that Five Points was a two-hour drive from his house, he "decided instead to take a leave of absence from his employment with DOCCS." (*Id.* ¶ 142). While on leave, he learned that a doctor at Cayuga Correctional Facility—which was only 40 minutes away from his home—was going to retire, and in November 2019, he contacted Morley and Dinello and told them that he wanted to apply for the physician position at Cayuga once it was posted. (*Id.* ¶¶ 143–44). Morley told Plaintiff that he should accept an appointment at Southport Correctional Facility while he waited for the Cayuga position to open, at which point he could transfer. (*Id.* ¶ 145). He recommended that Plaintiff send his resume to the Superintendent at Cayuga in the meantime, and Plaintiff did so. (*Id.*). Morley told Plaintiff that "the only way [he would] not get the job in Cayuga [was] if the Superintendent's son want[ed] it," but because the Superintendent's son was not a doctor, Plaintiff "felt confident that he would be transferred to [Cayuga] very soon." (*Id.* ¶ 147).

Plaintiff's commute to Southport was a four-hour roundtrip, which was "treacherous and dangerous" in the winter. (*Id.* ¶ 146). While working at Southport, Plaintiff learned that the physician position at Cayuga had become vacant, and that he had not been notified. (*Id.* ¶ 148). On February 24, 2020, Plaintiff wrote to Morley that he had inquired about replacing the retiring doctor at Cayuga, and that the Superintendent had failed to respond to his letter of interest. (*Id.* ¶ 150). He filed a Reassignment Request Form with the Director of Human Resources in Albany on February 27, 2020, "stating that he wanted to be transferred to Cayuga" when the position became available. (*Id.* ¶ 151). Plaintiff also wrote to Dinello that day expressing interest in applying for the position at Cayuga and asking when it would be posted. (*Id.* ¶ 152). On March 5, 2020, Dinello wrote to Plaintiff that the position at Cayuga had been changed from a doctor to

a nurse practitioner, and it was ultimately assigned to a family practice per diem nurse practitioner, even though the facility had no internal medicine physician. (*Id.* ¶¶ 149, 153).

Plaintiff then realized that it would be "nearly impossible for him to continue working as a correctional physician," and because he could "no longer endure the hostility and difficult circumstances," he was "forced to prematurely retire from public service." (*Id.* ¶ 154). Four weeks later, Dinello posted for a doctor's position at Cayuga. (*Id.* ¶ 155). Plaintiff did not learn about the posting until November 2020, after the position had been filled; even though DOCCS "routinely invited doctors in retirement to return to work," Defendants never contacted Plaintiff about his interest in applying. (*Id.* ¶¶ 156–57).

## III.   DISCUSSION

### A.   Standard of Review

To survive a motion to dismiss under Rule 12(b)(6) for failure to state a claim, "a complaint must provide 'enough facts to state a claim to relief that is plausible on its face.'" *Mayor & City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 135 (2d Cir. 2013) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The plaintiff must provide factual allegations sufficient "to raise a right to relief above the speculative level." *Id*. (quoting *Twombly*, 550 U.S. at 555). The Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See EEOC v. Port Auth.*, 768 F.3d 247, 253 (2d Cir. 2014) (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007)). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### B.   Sovereign Immunity

Defendants first argue that the Eleventh Amendment bars Plaintiff's § 1983 claims against DOCCS under the doctrine of sovereign immunity. (Dkt. No. 22-1, at 8–9). The Court

agrees. Sovereign immunity bars a suit in federal court against a state, absent the state's consent to suit or congressional abrogation of immunity. *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 54–55 (1996); *Kostok v. Thomas*, 105 F.3d 65, 68 (2d Cir. 1997). "New York has not waived its immunity, nor has Congress abrogated it." *Jackson v. Ramirez*, 691 F. App'x 45, 46 (2d Cir. 2017) (summary order) (first citing *Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 39 (2d Cir. 2017); and then citing *Dube v. State Univ. of N.Y.*, 900 F.2d 587, 594 (2d Cir. 1990)); *see also Walker v. NYS Justice Ctr. for the Prot. of People with Special Needs*, 493 F. Supp. 3d 239, 246 (S.D.N.Y. 2020) ("Congress did not abrogate the States' sovereign immunity when it enacted §§ 1983 and 1985, and New York has not waived its immunity." (citing, inter alia, *Mamot v. Bd. of Regents*, 367 F. App'x 191, 192 (2d Cir. 2010))). "DOCCS, as an arm of the state, stands in the same position as the State of New York." *White v. New York*, No. 19-cv-0543, 2019 WL 2578270, at *1, 2019 U.S. Dist. LEXIS 105272, at *2 (S.D.N.Y. June 24, 2019) (citing *Bryant v. N.Y. State Dep't of Corr. Servs. Albany*, 146 F. Supp. 2d 422, 426 (S.D.N.Y. 2001)). Thus, the § 1983 causes of action against DOCCS are dismissed.[6]

### C.    First Amendment Retaliation

Plaintiff alleges that Defendants retaliated against him for engaging in protected First Amendment speech. (Dkt. No. 1, ¶¶ 168–79). Defendants move to dismiss Plaintiff's First Amendment retaliation claim on the grounds that: (1) Plaintiff's speech was not constitutionally protected; (2) there was no adverse action; (3) there was no causal connection between any protected speech and any alleged adverse action; and (4) Plaintiff has failed to plead the personal

---

[6] It is not clear why Plaintiff argues that his claims may proceed against state officials in their official capacities, (Dkt. No. 24, at 12), because he has not alleged any official capacity claims; nor he alleged any ongoing violation of federal law for which an official could provide prospective relief. *See Deposit Ins. Agency v. Superintendent of Banks* (*In re Deposit Ins. Agency*), 482 F.3d 612, 618 (2d Cir. 2007). The Court therefore need not address this argument.

involvement of several Defendants. (Dkt. No. 22-1, at 9–23). Plaintiff responds that he has

sufficiently alleged the elements of a First Amendment retaliation claim. (Dkt. No. 24, at 13–23).

"To survive a motion to dismiss, a plaintiff claiming that he was retaliated against in

violation of the First Amendment must plausibly allege that (1) he engaged in speech or activity

that was protected by the First Amendment; (2) he suffered an adverse employment action; and

(3) a causal connection existed between the adverse action and the protected activity." *Specht v.*

*City of New York*, 15 F.4th 594, 599–600 (2d Cir. 2021) (citing *Smith v. County of Suffolk*, 776

F.3d 114, 118 (2d Cir. 2015)).

### 1.    Protected Speech

"The speech of a public employee is protected by the First Amendment when the

employee speaks as a citizen on a matter of public concern, rather than pursuant to his

employment responsibilities." *Specht*, 15 F.4th at 600 (citing *Garcetti v. Ceballos*, 547 U.S. 410,

420–21 (2006)). Thus, as a public employee, Plaintiff must allege that he "engaged in citizen

speech," in other words, that he "spoke as a private citizen," and that "the speech at issue was on

a matter of public concern." *See Montero v. City of Yonkers, New York*, 890 F.3d 386, 399 (2d

Cir. 2018); *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

#### a.    Matter of Public Concern

Defendants argue that Plaintiff did not speak on a "matter of public concern" because his

speech "concerned only the impacts of the MWAP policy on his ability to perform his duties and

his professional reputation," which are "personal concerns and grievances related to [his]

employment and interactions with coworkers." (Dkt. No. 22-1, at 12–13). Plaintiff responds that

his speech "revolved around" a matter of public concern, as his opposition to the MWAP policy

was "motivated by his desire to protect all patients' welfare and a desire to correct the state's

wrongdoing," not a desire to "protect his job or reputation," and that the "public concern that was

the subject of [his speech] was the unethical medical care and the inhumane treatment of patients within the New York prison system." (Dkt. No. 24, at 15).

"Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600 (citing *Montero*, 890 F.3d at 399). "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). As the Second Circuit has explained:

> To identify matters of public concern, "we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]"

*Id.* (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)).

The Court concludes that Plaintiff has plausibly alleged that he spoke on a matter of public concern.[7] Plaintiff alleges that he complained to DOCCS officials that the MWAP policy "would likely result in litigation and ethical complaints to the Board of Medical Examiners," (Dkt. No. 1, ¶ 108); "interfered with proper patient care, caused patients to undergo needless tests and consultations, and created a potential for liability due to the resulting poor patient care,"

---

[7] The complaint contains instances of speech where the allegations do not make clear whether Plaintiff spoke, or the content or context of the speech. (*E.g.*, Dkt. No. 1, ¶¶ 112 (concerns about the MWAP policy "were raised"), 117 (Plaintiff "discussed his ongoing concerns with the MWAP policy"), 123 (Henderson ordered nurses to withhold assistance from Plaintiff because of his "continued opposition" to the policy), 139 (Henderson told Plaintiff to stop writing letters about the MWAP policy)). The Court cannot determine from the allegations whether these instances of speech are protected. *See Murphy v. City of Rochester*, 986 F. Supp. 2d 257, 275 (W.D.N.Y. 2013) (finding the plaintiff's allegations "unacceptably vague" in that they provided "scant detail as to the content of the speech" and did not "indicate to whom the speech was directed, the nature of the forum in which the speech was made, or when the instances of protected speech occurred"). Moreover, Plaintiff has not plausibly alleged that his September 2019 letter regarding his dispute with Henderson over the treatment of a hemophiliac patient had any relation to the MWAP policy or otherwise touched on a matter of public concern. (Dkt. No. 1, ¶¶ 127–28); *see Coward v. Gilroy*, No. 05-cv-285, 2007 WL 1220578, at *6, 2007 U.S. Dist. LEXIS 30075, at *18–20 (N.D.N.Y. Apr. 24, 2007) (finding that statements which were "specific and personal in nature" and related only to the treatment of one consumer were not of public concern).

(*id.* ¶ 110); created "significant problems in the management of patients and in administering proper community standards of care" and caused "unnecessary patient suffering," (*id.* ¶¶ 114–15); and was "preventing him from providing standard medical care to a number of chronically ill patients," (*id.* ¶ 116).

In *Dillon v. Suffolk County Department of Health Services*, the district court found that when a doctor at a correctional facility complained, inter alia, that medications were not being properly prescribed and administered and "injured and acutely ill patients were being neglected and left untreated," there was "no doubt" that her speech was of public concern, because "[t]hese incidents, the inadequacy of training and care within the facility, and the lack of a response to reported conditions implicate the health, welfare and safety of . . . individuals in the care of the state, [and] are matters of importance to the public." 917 F. Supp. 2d 196, 208 (E.D.N.Y. 2013) (quoting *McLaughlin v. Pezzolla*, No. 06-cv-0376, 2010 WL 56051, at *9, 2010 U.S. Dist. LEXIS 232, at *30 (N.D.N.Y. Jan. 4, 2010)). Similarly, Plaintiff's complaints about the MWAP policy went beyond its "interference with his ability to perform his job duties and the impact it may have on his professional reputation," as Defendants argue, (Dkt. No. 22-1, at 13), and extended to its effect on the health and safety of all patients, not just his own, as well as its potential to expose DOCCS to litigation and ethical complaints, which are matters of public concern. *See, e.g.*, *DiMarco v. Rome Hosp.*, No. 88-cv-1258, 1991 WL 336000, at *1, *8, 1991 U.S. Dist. LEXIS 16603, at *3, *24 (N.D.N.Y. June 29, 1991) (finding complaints raising "questions about . . . the professional conduct and medical judgment of several of his colleagues and the nursing staff, the Hospital's overall patterns and practices, and the leadership and

competence of those individuals who were responsible for managing the Hospital" were matters

of public concern).[8]

### b. Speaking as a Private Citizen

When determining whether a public employee spoke as a private citizen, courts ask two

questions: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B)

does a civilian analogue exist?" *Matthews*, 779 F.3d at 173 (citing *Weintraub v. Bd. of Educ. of

City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203–04 (2d Cir. 2010)). Within this inquiry,

"[a]lthough the presence or lack of a civilian analogue may be of some help in determining

whether one spoke as a citizen, '[t]he critical question . . . is whether the speech at issue is itself

ordinarily within the scope of an employee's duties.'" *Montero*, 890 F.3d at 397–98 (2d Cir.

2018) (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)).

### i. Official Responsibilities

Courts have adopted a "functional approach" to assessing whether speech falls outside of

an employee's official responsibilities, focusing on the employee's "actual, functional job

responsibilities." *See Matthews*, 779 F.3d at 173–74. Because of the fact-intensive nature of this

inquiry, it is not subject to a bright-line rule: courts look to "the nature of the plaintiff's job

responsibilities, the nature of the speech, and the relationship between the two." *Id.* at 173

(quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012)).

---

[8] Defendants cite several cases in which courts noted that speech does not relate to a matter of public concern when the speech is "calculated to redress personal grievances," *Agosto v. N.Y.C. Dep't of Educ.*, 982 F.3d 86, 95 (2d Cir. 2020), seeks to "vindicate personal interests," *Nagle v. Fried*, No. 07-cv-2860, 2010 WL 8917844, at *5, 2010 U.S. Dist. LEXIS 144983, at *15 (S.D.N.Y. Mar. 17, 2010), *vacated sub nom. Nagle v. Marron*, 663 F.3d 100 (2d Cir. 2011), or concerns a "change in the employee's own duties," *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 399 (2011). (Dkt. No. 22-1, at 11–12). As discussed above, Plaintiff's speech extended beyond personal grievances and interests or a change in his own duties.

Moreover, because the nature of this inquiry is so "fact intensive and context specific," courts often decline to determine whether speech was part of an employee's job duties at the motion to dismiss stage. *See Schultz v. County of Suffolk*, No. 19-cv-0925, 2020 WL 7699944, at *6, 2020 U.S. Dist. LEXIS 164506, at *16–17 (E.D.N.Y. Sept. 4, 2020), *report and recommendation adopted*, 2020 WL 7041090, 2020 U.S. Dist. LEXIS 224667 (E.D.N.Y. Nov. 30, 2020); *see also Buchanan v. City of New York*, 556 F. Supp. 3d 346, 357 (S.D.N.Y. 2021) (collecting cases, and noting that "district courts frequently deny as premature pre-discovery motions to dismiss on the grounds that the plaintiff spoke as an employee").

In *Matthews*, a police officer informed precinct commanding officers that a precinct-wide quota system was "causing unjustified stops, arrests, and summonses because police officers felt forced to abandon their discretion in order to meet their numbers" and "was having an adverse effect on the precinct's relationship with the community." 779 F.3d at 169 (quotation marks omitted). The Second Circuit found that the officer spoke as a private citizen, because policy-oriented speech was "neither part of his job description nor part of the practical reality of his everyday work"; his job did not involve reporting misconduct or commenting on precinct-wide policy, and he had "no role in setting policy" nor was he "expected to speak on policy" or "consulted on formulating policy." *Id.* at 174. Moreover, he did not regularly communicate with these commanding officers beyond "hallway small talk." *Id.* Thus, because the officer's "actual, functional job responsibilities did not include reporting his opinions on precinct-wide quota systems to the Precinct commanders," and his speech was neither what he was employed to do, nor "'part-and-parcel' of his regular job," the Second Circuit found that he spoke as a private citizen:

> We hold that when a public employee whose duties do not involve
> formulating, implementing, or providing feedback on a policy that

> implicates a matter of public concern engages in speech concerning
> that policy, and does so in a manner in which ordinary citizens
> would be expected to engage, he or she speaks as a citizen, not as a
> public employee.

*Id.*; *see also Buchanan*, 556 F. Supp. 3d at 358–59 (denying motion to dismiss for lack of citizen

speech where plaintiffs, employees of the Civilian Complaint Review Board ("CCRB"),

allegedly wrote to CCRB officials challenging "high-level CCRB policies and practices relating

to [body camera] footage" because the plaintiffs had not conceded that "their day-to-day work

involved high-level policy formation and implementation, let alone the formulation and

implementation of the specific policies at issue"); *Gusler v. City of Long Beach*, No. 10-cv-2077,

2016 WL 11493644, at *19 (E.D.N.Y. Aug. 4, 2016)[9] (finding when a fire department lieutenant

wrote to the City Manager questioning decisions by the chief, he was speaking as a citizen,

because the record evidence did not suggest that "the plaintiff's duties included complaining

about his supervisors, accusing them of misconduct, or sharing his views on fire department

policy," and he had "no role in setting policy").

    Here, Plaintiff alleges that, as Facility Director at Walsh RMU, he was "the prison's

highest medical authority," (Dkt. No. 1, ¶ 21), and that his duties included "overseeing all

medical staff including doctors, nurse practitioners, nurses, physical and occupational therapists,

radiology technicians, and the pharmacy supervisor," and supervising "the treatment of 152

patients at Walsh RMU who had extreme medical pathology," (*id.* ¶¶ 35, 100). Plaintiff and the

doctors and nurses he supervised were also "responsible for evaluating and performing scheduled

examinations" of patients, referring patients outside for specialized treatment, and "prescribing,

modifying, or declining the specialist-recommended medications." (*Id.* ¶¶ 36–37). As Facility

---

[9] No LEXIS cite available.

Director, Plaintiff reported directly to Superintendent and indirectly to the RMD. (*Id.* ¶ 21). The Superintendent and RMD, in turn, reported to the Deputy Commissioner or Chief Medical Officer. (*Id.* ¶ 20).

Plaintiff does not allege that any of his duties as Facility Director involved formulating, implementing, or providing feedback on DOCCS-wide policies such as the MWAP policy. *See Matthews*, 779 F.3d at 174. Rather, Plaintiff alleges that Dinello was "empowered to institute policies and procedures" and drafted the MWAP policy, (Dkt. No. 1, ¶¶ 64–65), and does not allege that he was consulted during this process.

Defendants note that Plaintiff complained solely "internally to supervisors within his chain of command." (Dkt. No. 22-1, at 12). However, as Plaintiff notes, while the fact that a statement was made internally may be relevant in determining whether the employee spoke as a citizen or employee, it is not dispositive. *See, e.g.*, *Brown v. Office of State Comptroller*, 211 F. Supp. 3d 455, 465 (D. Conn. 2016) ("[A]n employee may be considered to be speaking as a citizen even though the speech is to a supervisor, relates to her employment, and was spoken in the workplace." (citation omitted)). Moreover, Plaintiff made several of his complaints regarding the MWAP policy directly to Koenigsmann, who was then Chief Medical Officer, (*see* Dkt. No. 1, ¶¶ 108, 114, 116); there is no indication that Plaintiff reported to Koenigsmann or regularly communicated with Koenigsmann or that doing so was part of his job responsibilities. *See Matthews*, 779 F.3d at 174.

Defendants also argue that Plaintiff's speech "concerned only the impacts of the MWAP policy on his ability to perform his duties and his professional reputation." (Dkt. No. 22-1, at 12). *See, e.g.*, *Weintraub*, 593 F.3d at 203 (holding that a teacher's grievance with his union regarding his supervisor's failure to discipline a student was "'pursuant to' his official job duties because it

was 'part-and-parcel of his concerns' about his ability to 'properly execute his duties'" (citation omitted)). However, as discussed above, the Second Circuit has held that "when a public employee whose duties do not involve formulating, implementing, or providing feedback on a policy that implicates a matter of public concern engages in speech concerning that policy, and does so in a manner in which ordinary citizens would be expected to engage, he or she speaks as a citizen, not as a public employee." *Matthews*, 779 F.3d at 174. Thus, the Court finds that Plaintiff has plausibly alleged that his speech fell outside his official responsibilities.

### ii.      Civilian Analogue

"Speech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" *Matthews*, 779 F.3d at 175 (quoting *Jackler*, 658 F.3d at 238). In *Matthews*, the Second Circuit found that a police officer's speech had a civilian analogue when, rather than going through formal internal grievance procedures, he "went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints." *Id.* at 176. The Court noted that these Precinct commanders attended monthly Community Council meetings, met with members of the community, and "regularly heard civilian complaints about Precinct policing issues." *Id.*; *see also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 509–10 (S.D.N.Y. 2015) (finding on summary judgment that an NYPD officer's speech had a civilian analogue when he spoke at a performance evaluation and appeal meeting, but also with the Internal Affairs Bureau and Quality Assurance Division, noting that any citizen can report wrongdoing to the IAB, and that it was not clear from the record whether the public can report to the QAD, which would "remain a question for trial"); *cf. Weintraub*, 593 F.3d at 204 (finding a teacher's speech was not protected when she lodged a union grievance, which is not a channel available to non-employees).

Here, Plaintiff alleges that he emailed, met with, wrote letters to, and spoke on the phone with various DOCCS officials, including Superintendent Gonyea, RMD Dinello, and Chief Medical Officer Koenigsmann. Plaintiff does not allege whether members of the public could engage in these methods of communication with DOCCS officials, and his allegations suggest that each of these officials were within his chain of command. (*See* Dkt. No. 1, ¶¶ 20–21 (explaining the Facility Directors report to Superintendents and RMDs, who report to the Deputy Commissioner or Chief Medical Officer)); *see also Calvelos v. City of New York*, No. 19-cv-6629, 2020 WL 3414886, at *14, 2020 U.S. Dist. LEXIS 109266, at *40 (S.D.N.Y. June 22, 2020) (finding that "intra-facility complaints to the command staff" by a corrections officer lacked a civilian analogue); *Flynn v. N.Y. State Dep't of Corr.*, No. 17-cv-2864, 2018 WL 2041713, at *6, 2018 U.S. Dist. LEXIS 72277, at *15–16 (S.D.N.Y. Apr. 30, 2018) (rejecting plaintiff's argument that her complaints were "outside of the chain of command" because the official she complained to was "several levels above [her] at DOCCS," because the official did not "entertain[] complaints from private citizens"); *Ross*, 693 F.3d at 307 ("Taking a complaint up the chain of command to find someone who will take it seriously 'does not, without more, transform [his] speech into protected speech made as a private citizen.'" (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011))).

Thus, at this stage, Plaintiff has not plausibly alleged that he spoke through a channel available to citizens generally. However, "the lack of a civilian analogue [i]s not critical to a decision as to whether [Plaintiff] spoke as a private citizen," as the critical question is whether the speech at issue itself was ordinarily within the scope of an employee's duties. *See Montero*, 890 F.3d at 397–98 (quoting *Lane*, 573 U.S. at 240); *Ross*, 693 F.3d at 307 ("Speech to a supervisor even in the workplace can be protected as that of a private citizen if it is not made

pursuant to the employee's official duties as an employee."). Therefore, although Plaintiff has

not plausibly alleged that his speech lacked a civilian analogue, at this early stage of the case, the

Court finds that he has plausibly alleged that he spoke outside of his official duties on a matter of

public concern, and thus plausibly alleged that he engaged in protected speech.

### 2.    Adverse Action

Defendants argue that Plaintiff has not alleged that any of the actions taken by

Defendants constituted adverse actions. (Dkt. No. 22-1, at 14–18). Plaintiff responds that he has

plausibly pled the adverse action of constructive discharge. (Dkt. No. 24, at 16–19).

"For purposes of the First Amendment, an 'adverse employment action' is one that

'would deter a similarly situated individual of ordinary firmness from exercising his or her

constitutional rights[.]'" *Specht*, 15 F.4th at 604 (quoting *Dawes v. Walker*, 239 F.3d 489, 493

(2d Cir. 2001)). "[The] test for determining whether an employer has taken adverse action is not

wooden: it must be 'tailored to the different circumstances in which retaliation claims arise.'" *Id.*

(first citing *Dawes*, 239 F.3d at 493, and then citing *Cox v. Warwick Valley Cent. Sch. Dist.*, 654

F.3d 267, 273 (2d Cir. 2011) (applying the adverse action test but "[r]ecognizing that [the] test is

highly context-specific")).

As a threshold matter, the Court agrees with Defendants that enforcement of the MWAP

policy does not constitute an adverse employment action, given that there are no allegations that

the policy was selectively enforced against Plaintiff. (*See* Dkt. No. 22-1, at 14–15 (first citing

*Morgan v. Colvin*, No. 15-cv-00107, 2016 WL 7168015, at *26, 2016 U.S. Dist. LEXIS 169643,

at *64 (D. Me. Dec. 7, 2016) ("[Plaintiff] concedes that merely enforcing rules does not amount

to an adverse employment action."), *report and recommendation adopted* 2017 WL 318629,

2017 U.S. Dist. LEXIS 8634 (D. Me. Jan. 23, 2017), *aff'd sub nom. Morgan v. Berryhill*, No. 17-

1187 (1st Cir. 2017), and then citing *Sales v. Smith*, No. 11-cv-00239, 2012 WL 5389675, at *6,

2012 U.S. Dist. LEXIS 157454, at *15–16 (S.D. Ohio Nov. 2, 2012) (finding that the plaintiff had not shown adverse action when he alleged that the defendant "simply enforced prison rules against him" and "fail[ed] to provide any evidence to support his allegations of selective enforcement"), *report and recommendation adopted* 2013 WL 1327069, 2013 U.S. Dist. LEXIS 44698 (S.D. Ohio Mar. 28, 2013)). Plaintiff does not allege that the MWAP policy was selectively enforced; in fact, he alleges that RMDs "repeatedly and systematically refused the prescription or re-prescription of MWAPs to patients in desperate need . . . no matter the recommendations of treating providers and specialists," (Dkt. No. 1, ¶ 86), and that other medical providers at Mohawk and Walsh RMU also challenged the application of the MWAP policy to their patients, (*id.* ¶¶ 103–105). Although Plaintiff alleges that he was "singled out" and "treated differently than the other medical providers," (*id.* ¶ 106), Plaintiff does not allege any facts suggesting there was differential treatment with respect to the enforcement of the MWAP policy. Thus, the Court finds that Plaintiff's allegations regarding Defendants' denial of his MWAP medication requests in accord with the MWAP policy, (*e.g.*, Dkt. No. 1, ¶¶ 115, 118, 121, 131, 138), do not plausibly allege an adverse employment action.[10]

Plaintiff alleges that he faced the following conditions at Walsh RMU, aside from enforcement of the MWAP policy: (1) Henderson locked him out of the facility, demanded he go into her office, and "berated him for prescribing a[n] MWAP medication and then filing a complaint about her," (*id.* ¶ 122); (2) in mid-2019, Henderson and Parkmond "ordered nurses to withhold assistance from [Plaintiff] for several patients," (*id.* ¶ 123); (3) Henderson prohibited

---

[10] The Court also notes that the MWAP policy was a DOCCS-wide policy that pre-dated Plaintiff's protected speech, and, as such, Plaintiff has not plausibly alleged a causal connection between his protected speech and the consistent enforcement of the policy. *See Morales v. City of New York*, No. 21-cv-925, 2022 WL 2840035, at *2, 2022 U.S. App. LEXIS 20112, at *3 (2d Cir. 2022) (summary order) (noting that for a First Amendment retaliation claim, a plaintiff must ultimately "establish that protected speech was a but-for cause of some adverse employment action").

nurses from assisting Plaintiff in the treatment of a hemophiliac patient after Plaintiff ordered

that the patient be permitted to self-administer his medication, (*id.* ¶¶ 124–27); (4) after

Plaintiff's request for medication for a quadriplegic patient was denied, Henderson and Dinello

prohibited him from treating this patient and Henderson ordered correctional officers to prohibit

him from entering the patient's room, (*id.* ¶¶ 129–33); (5) Henderson disregarded Plaintiff's

treatment order for a patient with multiple sclerosis who needed catheters in favor of a treatment

order which was "[in]consistent with standard medical care," (*id.* ¶¶ 134–37); and (6) on "many

occasions," Plaintiff's "treatment plans and those of other doctors that served with him were

materially interfered with or denied by the Defendants," (*id.* ¶ 140). Plaintiff also alleges that

Defendants frustrated his attempts at obtaining a transfer to a position at Cayuga. (*Id.* ¶¶ 143–

57).

Defendants assert that (1) Plaintiff's allegations about interference with treatment of his

patients at Walsh RMU does not plausibly allege constructive discharge, because Plaintiff does

not allege that he was "forced to resign," and a "voluntary leave of absence where the plaintiff

remains employed and returns to work a mere two months later does not constitute constructive

discharge," (Dkt. No. 22-1, at 16– 17 (arguing that Plaintiff's allegations that he declined an

opportunity to work at Five Points, took a leave of absence instead, and then "voluntarily

decided to return to Southport" "fall well short of the requirements to plead adverse action by

way of constructive discharge")),[11] and (2) once he was at Southport, Plaintiff's allegations that

Defendants frustrated his efforts to obtain a position at Cayuga "again fall well short of

---

[11] As to Plaintiff's decision not to accept the position at Five Points, although "[a]n employee who fails to explore alternative avenues offered by her employer before concluding that resignation is the only option cannot make out a claim of constructive discharge," *Cooper v. Wyeth Ayerst Lederle*, 106 F. Supp. 2d 479, 495 (S.D.N.Y. 2000), Plaintiff alleges that Five Points would have been a two-hour commute from his house, and Plaintiff did ultimately pursue alternatives to resignation including a temporary leave followed by a transfer to Southport.

satisfying the adverse action requirement," because failure to provide Plaintiff with a transfer of

his choosing is, alone, insufficient to plead constructive discharge, (*id.* at 17–18).

"A constructive discharge occurs where an employer, rather than discharging an

employee directly, intentionally creates a work atmosphere so intolerable that he is forced to quit

involuntarily." *Ocasio v. Mohawk Valley Comm. Coll.*, 20-cv-1355, 2021 WL 4477241, at *10,

2021 U.S. Dist. LEXIS 187890, at *28 (N.D.N.Y. Sept. 30, 2021) (citing *Ryle v. Rehrig Pac.*

*Co.*, 19-cv-1478, 2020 WL 6196144, at *10, 2020 U.S. Dist. LEXIS 195962, at *29 (N.D.N.Y.

Oct. 22, 2020)) (internal quotations and alterations omitted). "[W]orking conditions are

intolerable when, viewed as a whole, they are 'so difficult or unpleasant that a reasonable person

in the employee's shoes would have felt compelled to resign.'" *Terry v. Ashcroft*, 336 F.3d 128,

152 (2d Cir. 2003) (quoting *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 89 (2d Cir.

1996)).

The Court agrees with Defendants that a temporary leave of absence, standing alone,

likely would not rise to the level of a constructive discharge. *See, e.g.*, *Brescia v. LTF Club*

*Mgmt. Co., LLC*, No. 18-cv-08715, 2020 WL 137311, at *7, 2020 U.S. Dist. LEXIS 7163, at

*20–21 (S.D.N.Y. Jan. 9, 2020) ("A suspension or leave of absence may be sufficient to

establish a constructive termination, but the case law reveals that the suspension or leave

generally must be of a 'permanent' nature.").

But in his opposition brief, Plaintiff responds that while he first took a leave of absence in

September 2019, he then took a temporary assignment at Southport with an arduous commute

while he waited for a position at Cayuga to open. (*See* Dkt. No. 24, at 18–19). Aside from

asserting that Plaintiff's decision to return from his leave of absence to work at Southport "fall[s]

short of the requirements to plead adverse action by way of constructive discharge," (Dkt. No.

22-1, at 17), Defendants do not address whether this unique set of facts—a short leave of absence, followed by a transfer to a position with an untenable commute, followed by retirement—plausibly states a claim of constructive discharge.

"[D]istrict courts in this Circuit and several United States courts of appeals have applied the constructive discharge doctrine to situations where an employee voluntarily transfers to a different position with the same employer." *United States v. N.Y.C. Dep't of Educ.*, Nos. 16-cv-4291, 16-cv-4844, 2017 WL 435940, at *7, 2017 U.S. Dist. LEXIS 13603, at *22–23 (S.D.N.Y. Jan. 31, 2017), *report and recommendation adopted*, 2017 WL 1319695, 2017 U.S. Dist. LEXIS 51379 (S.D.N.Y. Apr. 4, 2017); *see also Claes v. Boyce Thompson Inst. for Plant Research*, 88 F. Supp. 3d 121, 126–127 (N.D.N.Y. 2015) (applying the constructive discharge doctrine where an employee accepted a transfer of employment); *Ley v. Dep't of Corr. & Cmty. Supervision*, No. 17-cv-918, 2020 WL 4928208, at *9, 2020 U.S. Dist. LEXIS 44470, at *26–30 (W.D.N.Y. Mar. 11, 2020) (same), *report and recommendation adopted* 2020 WL 4926549, 2020 U.S. Dist. LEXIS 152270 (W.D.N.Y. Aug. 21, 2020). To show that a voluntary transfer constituted a constructive discharge, an employee must allege that "(1) [he] was [retaliated] against to the point that working conditions were so intolerable that a reasonable person in [his] shoes would feel compelled to transfer; and (2) [his] transfer created a materially significant disadvantage in the terms and conditions of [his] employment." *N.Y.C. Dep't of Educ.*, 2017 WL 435940, at *8, 2017 U.S. Dist. LEXIS 13603, at *24.

Here, Plaintiff has plausibly alleged that the conditions at Walsh RMU, viewed as a whole, would be intolerable for a doctor in his position. Although Defendants assert that the interference with treatment of patients had "no bearing upon the material terms and conditions of [Plaintiff's] employment," (Dkt. No. 22-1, at 16), Plaintiff alleges that, as a physician, he was

"[g]uided by his *Hippocratic Oath* 'to do good or to do no harm'" and had an "ethical

responsibility not to discriminate against patients on the basis of . . . incarceration status," and

that "[u]ltimately, the decision as to the proper medical treatment to inmates l[ay] with the prison

physicians." (Dkt. No. 1, ¶¶ 26, 27, 38). In tension with Plaintiff's ethical and professional

obligations, Defendants allegedly ordered assistance withheld from him, prevented him from

treating and accessing patients, imposed treatments which were inconsistent with standard

medical care, and berated him for complaining about "unnecessary suffering and inhumane

treatment." (*Id.* ¶¶ 122–140). While "routine disagreements with supervisors or mild criticisms . .

. are simply insufficient to establish the sort of 'intolerable' working conditions necessary to a

constructive discharge claim," *Miller v. Praxair, Inc.*, 408 F. App'x 408, 410 (2d Cir. 2010),

"working conditions are intolerable when, viewed as a whole, they are 'so difficult or unpleasant

that a reasonable person *in the employee's shoes* would have felt compelled to resign,'" *Terry*,

336 F.3d at 152 (emphasis added). Here, Plaintiff has plausibly alleged that a reasonable

physician and Facility Director in his shoes would find these conditions intolerable.

  Plaintiff has also plausibly alleged that his transfer to Southport created a materially

significant disadvantage in the terms and conditions of his employment. "A 'materially

significant disadvantage' in working conditions includes 'a decrease in wage or salary, a less

distinguished title, a material loss of benefits, or other indices . . . unique to the particular

situation.'" *N.Y.C. Dep't of Educ.*, 2017 WL 435940, at *8, 2017 U.S. Dist. LEXIS 13603, at *25

(citing *Williams v. R.H. Donnelly, Corp.*, 368 F.3d 123, 128 (2d Cir. 2004)). "It 'must be more

disruptive than a mere inconvenience or alteration of job responsibilities.'" *Id.* (citing *Williams*,

368 F.3d at 128). Here, Plaintiff alleges that Southport was a two-hour drive from his house (four

hours round-trip), and that during the winter, the drive was "treacherous and dangerous." (Dkt.

No. 1, ¶ 146). The Court finds these allegations sufficient to allege that the "treacherous" commute to Southport rose above a "mere inconvenience," and constituted a significant disadvantage in Plaintiff's working conditions. *See Quiroz v. Ganna Const.*, No. 97-cv-0480, 1999 WL 59836, at *21, 1999 U.S. Dist. LEXIS 1285, at *68–69 (N.D. Ill. Jan. 26, 1999) (finding the plaintiff's allegations that after she complained the defendant assigned her to a work project requiring a five-hour commute, a jury could "find that these facts demonstrate[d] intolerable working conditions"); *Fuller v. Belleville Area Cmty. Coll. Dist. No. 522*, No. 18-cv-01123, 2020 WL 1287743, at *5, 2020 U.S. Dist. LEXIS 46708, at *15–16 (S.D. Ill. Mar. 18, 2020) (finding that moving the plaintiff to a location requiring a four-hour roundtrip commute was "a plausibly-pleaded adverse employment action").

Thus, at this stage, and absent briefing from the parties on whether Plaintiff's voluntary transfer to Southport constituted a constructive discharge, the Court cannot say as a matter of law that the transfer is not an adverse employment action and therefore declines to dismiss Plaintiff's First Amendment claim for failure to allege an adverse employment action.[12]

### 3.    Causation

Defendants argue that Plaintiff has not alleged a causal connection between his speech regarding the MWAP policy and any adverse employment action. (Dkt. No. 22-1, at 18–20). Defendants assert that (1) there is no direct evidence of discriminatory animus, and (2) causation cannot be inferred through disparate treatment or temporal proximity. (*Id.* at 19–20). Plaintiff responds that Defendants' retaliation "was simultaneous and continuous" with his speech, and notes that Henderson "berated him for his opposition of the MWAP policy" and "order[ed] him to stop writing letters . . . about the MWAP [p]olicy." (Dkt. No. 24, at 20–21).

---

[12] The Court therefore does not address Plaintiff's allegations about the Cayuga position or his ultimate retirement.

To prevail on a First Amendment retaliation claim, a plaintiff must ultimately "establish that protected speech was a but-for cause of some adverse employment action." *Morales*, 2022 WL 2840035, at *2, 2022 U.S. App. LEXIS 20112, at *3 (citing *Morris*, 196 F.3d at 110). Causation can be established "either indirectly by means of circumstantial evidence, for example, by showing that the protected activity was followed by adverse treatment in employment, or directly by evidence of retaliatory animus." *Id.* (citing *Morris*, 196 F.3d at 110).

Plaintiff has plausibly alleged retaliatory animus through his allegations that Henderson "berated him for prescribing a[n] MWAP medication and then filing a complaint about her," (Dkt. No. 1, ¶ 122), and called him into her office numerous times to "tell him to stop writing letters to the DOCCS' Commissioner and Chief Medical Officer in Albany about the MWAP policy," (*id.* ¶ 139); *see, e.g.*, *Mandell v. County of Suffolk*, 316 F.3d 368, 383–84 (2d Cir. 2003) (finding direct evidence of retaliatory animus in failure to promote where superiors told the employee that he should learn to "keep his mouth shut" and that "baggage" from his testimony about antisemitism in the police department could adversely affect his career). These incidents occurred in June and July 2019, around the time Defendants Henderson, Dinello, and Parkmond allegedly interfered with Plaintiff's treatment of several patients in "mid-2019." (*Id.* ¶ 123). Although Plaintiff does not allege a specific incident of protected speech after November 1, 2017, (*see* ¶ 116; *see also supra* note 8), Plaintiff alleges that his opposition to the MWAP policy continued into mid-2019, (*see id.* ¶¶ 123, 139). Plaintiff therefore has plausibly alleged that his speech was causally connected to the adverse employment action he experienced.

4.      **Personal Involvement**

Defendants argue that Plaintiff has failed to plausibly allege the personal involvement of

Defendants Koeningsmann and Parkmond in the alleged adverse actions. (Dkt. No. 22-1, at 20–

23).[13]

"[T]he 'personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.'" *Victory v. Pataki*, 814 F.3d 47, 67 (2d Cir.

2016) (quoting *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)); *see also Warren v. Pataki*,

823 F.3d 125, 136 (2d Cir. 2016); *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir.

2015). A plaintiff must "allege a tangible connection between the acts of a defendant and the

injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). The Second Circuit

recently clarified that "there is no special rule for supervisory liability" and explained that "a

plaintiff must plead and prove 'that each Government-official defendant, through the official's

own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609,

618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676).

Defendants first assert that Plaintiff has failed to plausibly allege Koenigsmann's

personal involvement because, while Plaintiff alleges that Koenigsmann was aware of his

"complaints concerning the MWAP policy," he has not alleged that Koenigsmann was involved

in "any alleged retaliatory acts that followed." (Dkt. No. 22-1, at 21–22). Plaintiff responds that

Koenigsmann was personally involved in the adverse actions against him because: (1)

Koenigsmann "initiated and orchestrated many of the events that flowed from his decision to

---

[13] Defendants also assert that "[t]o the extent Plaintiff premises his retaliation claim upon Defendant Morley's and
Dinello's actions that frustrated his efforts to obtain employment at Cayuga resulting in his constructive discharge,
Plaintiff has failed to plead Defendant Henderson's personal involvement in this adverse action." (Dkt. No. 22-1, at
22–23). But as discussed above, the Court declines to dismiss Plaintiff's First Amendment retaliation claim in light of
his allegations regarding his transfer to Southport. The Court therefore declines to dismiss the First Amendment
retaliation claim against Defendant Henderson for lack of personal involvement.

promulgate and strictly enforce the MWAP [p]olicy," and (2) Koenigsmann was "grossly negligent in supervising subordinates" who retaliated against Plaintiff. (Dkt. No. 24, at 21–22). However, because enactment and enforcement of the MWAP policy did not constitute an adverse employment action, Plaintiff has not plausibly alleged that Koenigsmann's "decision to promulgate and strictly enforce" the policy violated his constitutional rights. *See Jackson v. Annucci*, No. 20-cv-02008, 2021 WL 2581340, at \*5, 2021 U.S. Dist. LEXIS 117276, at \*14 (S.D.N.Y. June 23, 2021) (finding no personal involvement where the allegations did not "connect Annucci to the specific constitutional violations" alleged). And, following *Tangreti* it is not enough to allege that a supervisor was grossly negligent in the supervision of his subordinates. 983 F.3d at 620.

Second, Defendants assert that Plaintiff failed to allege Parkmond's personal involvement because the sole allegation in the Complaint relating to Defendant Parkmond's actions is: "In mid-2019, as a result of [Plaintiff's] continued opposition to the MWAP policy . . . Defendant Parkmond ordered nurses to withhold assistance from Dr. Salvana for several patients." (Dkt. No. 22-1, at 22 (citing Dkt. No. 1, ¶ 123)). Defendants note that this allegation is "vague" and provides "absolutely no details concerning the nature of these orders or when they occurred." (*Id.*). Plaintiff responds that Parkmond served in a supervisory role as Nurse Director; was aware of Plaintiff's opposition to the MWAP policy; and "directly engaged in retaliation" against Plaintiff. (Dkt. No. 24, at 21–22). But Parkmond's supervisory role is not sufficient to allege that she herself violated Plaintiff's First Amendment rights, and Plaintiff does not allege how Parkmond became "aware" of his opposition to the MWAP policy, nor does he detail her involvement in ordering nurses to withhold assistance from Plaintiff.

For the reasons above, Defendants' motion to dismiss the First Amendment retaliation claims against Defendants Koenigsmann and Parkmond for failure to plausibly allege their personal involvement is granted, and the motion to dismiss Plaintiff's First Amendment retaliation claim is otherwise denied.

### D.    Equal Protection

Defendants argue that Plaintiff's Equal Protection claim must be dismissed because: (1) it is duplicative of his First Amendment retaliation claim; (2) his "own allegations reveal that he was not treated differently due to belonging to the group of physicians who opposed the MWAP policy"; and (3) he has failed to plead adverse action, causal connection, and the personal involvement of the Defendants. (Dkt. No. 22-1, at 23–24). Plaintiff responds that he is not asserting a class-based Equal Protection claim, but rather a *LeClair* claim for selective treatment, and that his claim is not duplicative.[14] (Dkt. No. 24, at 23, 25–26 (citing *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980))).

To state a claim for an Equal Protection violation based on selective enforcement under *LeClair*, a plaintiff must allege that: "(1) the person, compared with others similarly situated, was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure the person." *Hu v. City of New York*, 927 F.3d 81, 91 (2d Cir. 2019) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). Thus, under this test, a plaintiff must show both

---

[14] Insofar as Plaintiff also raises a claim under a "class-of-one" theory of Equal Protection, in which a plaintiff alleges that he was "intentionally treated differently from others similarly situated with no rational basis for the difference in treatment," (*see* Dkt. No. 1, ¶¶ 161–62 (alleging that Plaintiff was treated differently than those similarly situated with "no rational basis")); *Vill. Of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000), the Supreme Court has held that "a 'class-of-one' theory of equal protection has no place in the public employment context," *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 594, 605–08 (2008).

"disparate treatment and impermissible motivation." *Id.* (quoting *Bizzarro v. Miranda*, 394 F.3d 82, 87 (2d Cir. 2005)).

Defendants argue that Plaintiff's Equal Protection and First Amendment claims are "premise[d] . . . upon the same protected conduct and purported adverse actions," and therefore, the Court should analyze his claim under the First Amendment as the "most explicit source of constitutional protection." (Dkt. No. 22-1, at 23–24 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989))). Plaintiff responds that his First Amendment claim is "driven by his protected right to speak out about wrongdoing and in doing so also petition government authorities to redress his concerns," while his "Equal Protection retaliation claim is focused on Defendants' conscious decision to retaliate by treating him differently from other health care providers who also opposed the MWAP policy." (Dkt. No. 24, at 25–26).

"Courts in the Second Circuit have dismissed equal-protection claims that merely restate First Amendment retaliation claims." *Best Payphones, Inc. v. Dobrin*, 410 F. Supp. 3d 457, 484 (E.D.N.Y. 2019) (declining to dismiss the plaintiff's First Amendment retaliation claims, but dismissing an Equal Protection claim "based on . . . protected First Amendment activity" as duplicative, noting that "courts should not unnecessarily stretch sections of the Constitution to reach wrongs already covered by other sections"); *see also Frisenda v. Inc. Vill. of Malverne*, 775 F. Supp. 2d 486, 518 (E.D.N.Y. 2011) (dismissing Equal Protection claim based on retaliation for First Amendment activity as duplicative and collecting cases); *Washington v. Afify*, 968 F. Supp. 2d 532, 541 (W.D.N.Y. 2013) (same).

Here, Plaintiff's claim is premised on the assertion that Plaintiff "was harassed, threatened, and otherwise treated with hostility *because he challenged the inhumane and negligent treatment of patients*," and that there was "no rational basis for the treatment Plaintiff

received . . . other than to discriminate and retaliate against him *for standing up for his patients*,"
(Dkt. No. 1, ¶¶ 159, 162 (emphases added)). The cases Plaintiff cites for the proposition that
"claims are duplicative when they arise out of the same facts and do not allege distinct damages"
did not involve First Amendment and Equal Protection claims. (*See* Dkt. No. 24, at 25 (first
citing *NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175–76 (2d Cir. 2008)
(finding that contract claims were not duplicative of claims for account stated because the
plaintiff could not recover attorney's fees on claims for account stated), and then citing *Estate of
D.B. v. Thousand Island Cent. Sch. Dist.*, 169 F. Supp. 3d 320, 338 (N.D.N.Y. 2016) (finding
that claims of negligent infliction of emotional distress and negligent supervision were "not so
similar as to warrant" dismissal as duplicative), *abrogated on other grounds by Christiansen v.
Omnicom Grp., Inc.*, 852 F.3d 195 (2d Cir. 2017))). And, insofar as Plaintiff argues that a party
may "properly allege alternative or even inconsistent claims or legal theories," (Dkt. No. 24, at
25 n.8 (first citing Fed. R. Civ. P. 8(a)(3) and 8(d)(2)–(3), and then citing *Manhattan Fuel Co. v.
New England Petroleum Corp.*, 422 F. Supp. 797, 802 (S.D.N.Y. 1976))), the question here is
whether Plaintiff may raise duplicative claims, not alternative or inconsistent ones.

Therefore, the Court dismisses Plaintiff's Equal Protection claim as duplicative of his
First Amendment claim.

###    E.    State Law Claims

Defendant moves to dismiss Plaintiff's state law claims under N.Y. Lab. Law § 741 and
N.Y. Civ. Serv. Law § 75-b, arguing, inter alia, that they are barred by N.Y. Correct. Law § 24
and, in any event, fail to state a claim. (Dkt. No. 22-1, at 25–29). Plaintiff, however, responds
that he has raised these claims only against DOCCS, not the individual Defendants; Plaintiff
accurately notes that N.Y. Correct. Law § 24 applies to claims "against any officer or employee
of the department . . . in his or her personal capacity," (Dkt. No. 22-1, at 25–26).

N.Y. Lab. Law § 741 and N.Y. Civ. Serv. Law § 75-b prohibit certain retaliatory conduct by certain public "employers," including the State of New York.[15] These claims, like Plaintiff's § 1983 claims against DOCCS, are barred by the doctrine of sovereign immunity.[16] "DOCCS, as an arm of the state, stands in the same position as the State of New York." *White*, 2019 WL 2578270, at *1, 2019 U.S. Dist. LEXIS 105272, at *2. While federal courts may exercise supplemental jurisdiction over state law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution," 28 U.S.C. § 1367(a), that grant of supplemental jurisdiction "does not extend to claims against nonconsenting state defendants." *Raygor v. Regents of the Univ. of Minn.*, 534 U.S. 533, 541–42 (2002); *see also Doe v. State Univ. of New York Purchase Coll.*, No. 21-cv-8417, 2022 WL 2972200, at *10, 2022 U.S. Dist. LEXIS 133690, at *32 (S.D.N.Y. July 27, 2022) ("The Supreme Court has also instructed that th[e] principle of Eleventh Amendment immunity 'applies as well to state-law claims brought into federal court under pendent jurisdiction.'" (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984))).

---

[15] *See* N.Y. Lab. Law § 741(1)(b), (2) (forbidding any "employer" from taking "retaliatory action against any employee," for objecting to a policy that the employee "reasonably believes constitutes improper quality of patient care" and defining "employer" to include "the state, or any political subdivision of the state which . . . operates and provides health care services under the mental hygiene law or the correction law"); N.Y. Civ. Serv. Law § 75-b(1)(a), (2)(a) (forbidding any "public employer" from "dismiss[ing] or tak[ing] other disciplinary or other adverse personnel action against a public employee," "because the employee discloses to a governmental body" certain specified information, and defining "public employer" to include the State of New York or as "any other public corporation, agency, instrumentality or unit of government which exercises governmental power under the laws of the state").

[16] Although Defendants assert that sovereign immunity "bars Plaintiff's claims against DOCCS in their entirety," (Dkt. No. 22-1, at 9), they do not specifically move for dismissal of Plaintiff's state law claims against DOCCS under this doctrine, (*see id.* (asserting that the complaint "must be dismissed to the extent it asserts section 1983 claims against DOCCS")). In any event, the Court may address the issue *sua sponte. See Atl. Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) ("Although the parties do not address the Eleventh Amendment in their briefs, we raise it *sua sponte* because it affects our subject matter jurisdiction.").

New York State has not waived its immunity from suit in federal court by virtue of

creating a state law cause of action under N.Y. Lab. Law § 741 and N.Y. Civ. Serv. Law § 75-b.

*See Vaden v. Connecticut*, 557 F. Supp. 2d 279, 289 (D. Conn. 2008) ("[S]tate statutory

provisions consenting to suit in state court . . . are not waivers of Eleventh Amendment immunity

from suit in federal court" (citing *Smith v. Reeves*, 178 U.S. 436, 441 (1900) ("A state does not

consent to suit in federal court by consenting to suit in the courts of its own creation."))); *Fry v.

McCall*, 945 F. Supp. 655, 661 (S.D.N.Y. 1996) ("[N.Y. Civ. Serv. Law] section 75–b does not

provide for jurisdiction in federal court or act as a waiver of Eleventh Amendment immunity.");

*Gonzalez v. N.Y.S. Div. of Human Rights*, No. 10-cv-98, 2011 WL 4582428, at *3, 2011 U.S.

Dist. LEXIS 114662, at *8 (S.D.N.Y. Sept. 29, 2011) ("It is well settled that New York has not

waived its immunity from suit in federal court for violations of state law" including N.Y. Civ.

Serv. Law § 75-b) .

Therefore, Plaintiff's N.Y. Lab. Law § 741 and N.Y. Civ. Serv. Law § 75-b claims

against DOCCS are barred by the Eleventh Amendment and must be dismissed.

## IV.    LEAVE TO AMEND

Plaintiff has requested leave to amend the complaint. (Dkt. No. 24, at 32). To the extent

that Plaintiff believes that he could allege facts to remedy the defects the Court has identified, the

Court will permit Plaintiff to file a letter motion seeking permission to amend. Any such motion

must be filed with a proposed amended complaint, and comply with N.D.N.Y. Local Rule

15.1(a), and must be filed by August 23, 2022. Defendant may respond in a letter brief by

August 30, 2022.

## V.    CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 22) is **GRANTED** as to Plaintiff's Equal Protection, N.Y. Lab. Law § 741, and N.Y. Civ. Serv. Law § 75-b claims (the First, Third and Fourth Causes of Action); and it is further

**ORDERED** that Defendants' motion to dismiss (Dkt. No. 22) is **GRANTED** as to Plaintiff's claims against Defendants DOCCS, Koenigsmann, and Parkmond; and it is further

**ORDERED** that Defendant's motion is otherwise **DENIED**; and it is further

**ORDERED** that if Plaintiff does not file a letter motion seeking leave to amend by August 23, 2022, Defendants DOCCS, Koenigsmann, and Parkmond will be terminated and Plaintiff's First Amendment retaliation claim under 42 U.S.C. § 1983 against Defendants Henderson, Dinello, and Morley will proceed.

**IT IS SO ORDERED.**

Dated: <u>August 10, 2022</u>
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge