**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

MICHAEL F. SALVANA, M.D.,

                                    Plaintiff,                    5:21-cv-00735 (BKS/ML)

v.

JOHN MORLEY, M.D., DAVID S. DINELLO, M.D.,
PATRICIA HENDERSON, R.N., and BETTY M.
PARKMOND, R.N.,

                                    Defendants.

---

**Appearances:**

*For Plaintiff:*
Carlo Alexandre C. de Oliveira
Cooper Erving & Savage LLP
20 Corporate Woods Boulevard, Suite 501
Albany, NY 12211

Richard Condit
Andrea Forsee
Mehri & Skalet, PLLC
2000 K Street, NW, Suite 325
Washington, DC 20006

*For Defendants:*
Letitia James
New York State Attorney General
Jorge A. Rodriguez
Assistant Attorney General, Of Counsel
The Capitol
Albany, NY 12224

Hon. Brenda K. Sannes, Chief United States District Judge:

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

Plaintiff Michael F. Salvana, M.D., a former Clinical Physician and Facility Health Services Director with the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action against DOCCS Deputy Commissioner and Chief Medical Officer John Morley, M.D.; Regional Medical Director for Elmira and Oneida "HUBS" David S. Dinello, M.D.; DOCCS Deputy Superintendent for Health Services Patricia Henderson, R.N.; and DOCCS Nurse Director Betty M. Parkmond, R.N. (Dkt. No. 38, ¶¶ 6, 13-16, 19, 28).[1] Plaintiff raises a First Amendment retaliation claim under 42 U.S.C. § 1983. (*Id.* ¶¶ 171–83).

Presently before the Court are Defendants' motion for summary judgment (Dkt. No. 92) and Plaintiff's motion for summary judgment (Dkt. No. 93), both filed pursuant to Rule 56 of the Federal Rules of Civil Procedure. Each motion is fully briefed, (Dkt. Nos. 92-9, 93-34, 98-3, 99, 101, 102, 105, 106). The Court heard oral argument on the motions on March 4, 2025. For the reasons that follow, Defendants' motion is granted and Plaintiff's motion is denied.

## II.    FACTS[2]

### A.    Plaintiff's and Defendants' Roles at DOCCS

DOCCS is "an executive agency of the State of New York charged with, *inter alia*, the oversight and administration of the state prison system and community supervision within the

---

[1] By Order entered on August 10, 2022, this Court granted in part a motion to dismiss the following claims asserted in the Complaint: Plaintiff's Equal Protection, N.Y. Lab. Law § 741, and N.Y. Civ. Serv. Law § 75-b claims, and Plaintiff's claims against Defendants DOCCS, former DOCCS Deputy Commissioner and Chief Medical Officer Carl Koenigsmann and DOCCS Nurse Director Betty M. Parkmond, R.N. (Dkt. No. 26). Plaintiff sought leave to file an amended complaint, which the Court granted in part, with respect to the new allegations as to Defendant Parkmond. (Dkt. No. 37).

[2] The facts, which are undisputed unless otherwise noted, are drawn from Defendants' Rule 56.1 Statement of Material Facts, (Dkt. No. 92-8), and Response to Plaintiff's Statement of Material Facts, (Dkt. No. 98-2), as well as Plaintiff's Rule 56.1 Amended Statement of Material Facts, (Dkt. No. 94), and Response to Defendants' Statement of Material

State." (Dkt. No. 92-8, ¶ 2). Salvana, a licensed medical doctor, became the Medical Director at Walsh Regional Medical Unit (RMU) in 2014. (Dkt. No. 98-2, ¶¶ 2, 10).[3] Walsh RMU is a maximum-security medical facility within the Mohawk Correctional Facility, "which provides medical services and treatment to incarcerated individuals with serious and chronic medical conditions requiring intensive treatment." (*Id.* ¶ 11). Each patient at Walsh RMU is assigned a medical team comprised of a clinician, nurses, and other appropriate staff, who meet weekly to discuss patient care and make decisions regarding patient treatment, "including medication decisions." (*Id.* ¶¶ 12–14). Plaintiff testified that in addition to his other duties as the Medical Director, he managed the care of the twenty or thirty sickest patients. (Dkt. No. 93-2, at 73).

As a Regional Medical Director (RMD) with DOCCS, Defendant David S. Dinello, M.D. *inter alia* managed physicians at DOCCS facilities, reviewed specialty requests, reviewed and created medical policies, took emergency provider telephone calls, and directly supervised Plaintiff with respect to medical issues arising from his position. (Dkt. No. 92-8, ¶¶ 13–17). When Plaintiff's tenure at Walsh RMU began, Defendant Patricia N. Henderson, R.N. was the Director of Nursing in the Walsh RMU, but she was promoted to acting Deputy Superintendent of Health (DSH) at Mohawk in August 2017 and to Mohawk DSH in January 2018. (*Id.* ¶¶ 20, 22–23). As DSH, Henderson was charged with, *inter alia*, administering and supervising the medical facilities and ensuring compliance with DOCCS policies. (*Id.* ¶¶ 26–27). Defendant Betty M. Parkmond, R.N. was a Registered Nurse Supervisor 1 at Walsh RMU until July 2019

---

Facts, (Dkt. No. 99-1), to the extent the facts are well-supported by pinpoint citations to the record, as well as the exhibits attached thereto and cited therein. The facts are construed in the light most favorable to the non-moving party. *See Gilles v. Repicky*, 511 F.3d 239, 243 (2d Cir. 2007).

[3] Plaintiff previously worked for DOCCS as a part-time physician at Mid-State Correctional Facility from 2003 to 2005, and at Walsh Regional Medical Unit from 2005 to 2011. (Dkt. No. 98-2, ¶¶ 7–9). He left DOCCS in 2011 and returned to Walsh RMU in 2014. (*Id.* ¶¶ 9–10).

when she was promoted to Director of Nursing at Walsh RMU. (*Id.* ¶¶ 29–30). In her latter role, she was charged with administration and management of nursing staff at Walsh RMU. (*Id.* ¶ 31).

### B.    The Medications With Abuse Potential Policy

Health Care Services Policy 1.24, otherwise known as the Medications With Abuse Potential ("MWAP") Policy was a medical services policy in effect at DOCCS from June 1, 2017, until February 8, 2021. (*Id.* ¶ 34). The goal of the policy was to address problems with addiction within DOCCS by assuring that addictive medications were only prescribed to incarcerated individuals when medically necessary. (*Id.* ¶ 36). In practice, the policy required that prescribers document the need for the use of medications with abuse potential and seek the approval of an RMD when prescribing medications with abuse potential, including opiates, benzodiazepines, all controlled substances listed in schedules two through four of the Controlled Substances Act, and certain noncontrolled substances such as pregabalin and gabapentin. (*Id.* ¶¶ 40, 42, 44). Defendant Dinello was "involved in the development and implementation of the MWAP policy," (Dkt. No. 98-2, ¶ 35), and according to Plaintiff, he was the "principal author." (*Id.*). On September 10, 2018, a revised MWAP Policy was issued that still required providers to document the need for use of medications with abuse potentials and seek approval for their use. (Dkt. No. 92-8, ¶¶ 59, 61).

### C.    Salvana's Opposition to the Policy

Salvana was opposed to the MWAP Policy, and complained to administrators at Walsh RMU, Mohawk, and DOCCS' central office. (*Id.* ¶¶ 68–70). On July 7, 2017, Plaintiff emailed a complaint from his DOCCS email account directly to then DOCCS Chief Medical Officer Koenigsmann,[4] Mohawk Superintendent Gonyea, then Deputy Superintendent Tousignant, and

---

[4] Dr. Carl Koenigsmann preceded Defendant Dr. John N. Morley as Chief Medical Officer of DOCCS. (Dkt. No. 98-2, ¶ 26). The CMO manages DOCCS' operations relating to the provision of medical services and develops, approves,

Defendant Henderson. (Dkt. No. 93-19, at 2). In that email, Plaintiff detailed Defendant

Dinello's denial of MWAP medications for a specific patient and explained why that patient

needed the medications. (*Id.*). Plaintiff then wrote:

> I have refused to stop these two medications as they are essential
> for this patient. I also don't need help in managing these
> medications given the extensive training I had on the pain service
> at Yale University Medical Center. This is not the only patient I
> manage that Dr Dinello has refused to approve needed medication
> on. These patients are now asking for there [sic] problem lists
> knowing there are attempts to stop essential medication. They are
> likely going to bring litigation and perhaps reports of denial of
> needed medication to the Board of Medical Examiners. If a
> medication is denied, I will continue to order it if there are no
> alternatives, as I know what is best for my patients whom I am in
> contact with on a daily basis. Your attention to this matter is
> needed ASAP.

(*Id.*). That same day, Koenigsmann replied to Plaintiff, copying only Gonyea, "You will be

hearing from Dr. Dinello to discuss a reasonable pain management program for this [patient], I

concur with your concerns." (*Id.*). On July 10, 2017, Plaintiff replied to Koenigsmann, copying

Gonyea, Tousignant, and Henderson, and stating:

> My concerns are not only for this patient but the many other
> inmates at Walsh who have very complicated histories and are
> among the most difficult to manage patients in DOCCS. . . .
> Several [Walsh inmates] are hinting at litigation involving
> consulting specialists recommending medications that are being
> denied. . . . I again am asking that the Walsh RMU be exempt from
> this prior approval policy given the nature of and number of
> patients we take care of.

(*Id.*). That same day, Koenigsmann replied to Plaintiff, copying only Dinello, "We will not be

exempting the RMU from the MWAP policy." (*Id.*).

---

and promulgates directives, policies, and procedures relating to medical care of incarcerated individuals at DOCCS
facilities. (Dkt. No. 92-8, ¶¶ 7, 10; Dkt. No. 99-1, ¶¶ 7, 10).

Later that month, on a bi-weekly call with the Office of the Commissioner of DOCCS, Superintendent Gonyea raised concerns about the MWAP Policy, and Associate Commissioner Charles F. Kelly asked him to provide some examples. (Dkt. No. 93-4, at 47). Plaintiff wrote a memorandum outlining eight examples of inmates with medical issues whose medications were denied. (*Id.* at 48–49). Plaintiff stated that "[t]he MWAP approval process is demeaning to the staff, interferes with good patient care and causes patients to undergo needless tests and consultations. The end point is poor patient care and potential litigation by inmates." (*Id.*). Gonyea sent the memorandum to Associate Commissioner Kelly in an email, stating, "I am sorry to have to bring this to the Commissioner's attention but I don't feel we have gotten anywhere when we addressed these concerns with Health Services." (*Id.* at 47). Associate Commissioner Kelly asked Assistant Commissioner Joan Smith, who reported to the CMO and assisted in overseeing healthcare at DOCCS facilities, to review the memorandum with Koenigsmann and provide comments before he would submit the memorandum to the Commissioner. (*Id.*; Dkt. No. 94, ¶ 27). Koenigsmann then emailed Dinello and asked him to comment on each of the examples so Koenigsmann could respond to the inquiry. (Dkt. No. 93-4, at 47.). Dinello subsequently emailed Plaintiff and asked him to provide specific DIN numbers[5] for each of the examples so that Dinello could "look into it." (*Id.*). Neither party has proffered an email reply from Plaintiff providing that information. Plaintiff contends that he never received a response from the Commissioner's office, nor from Koenigsmann or Dinello, and that he is unaware whether the Commissioner's office investigated the matter further. (*Id.* ¶ 23).

---

[5] A DIN number is an internal number used to identify an individual while in the custody of the Department of Corrections and Community Supervision. About the Parolee Lookup Glossary, N.Y. Dep't of Corr. & Cmty. Supervision, https://publicapps.doccs.ny.gov/ParoleeLookup/About?form=glossary (last visited Feb. 27, 2025).

On August 11, 2017, Dinello emailed Salvana, copying Gonyea, Henderson, and another

DOCCS employee stating:

> I have been informed by multiple sources that you are refusing to follow [the MWAP Policy]. I have been instructed by Dr. Koenigsmann to issue a Direct Order that you follow approved DOCCS Policy. Your compliance is expected. Actions that are out of compliance to the Direct Order of following [the MWAP Policy] will be met with the necessary actions. You can contact me at any time if you have questions and concerns regarding the Policy. I am always open to feedback and invite healthy collegial dialogue. Let me know if you have any questions.

(Dkt. No. 93-20, at 2).

On August 14, 2017, Dinello emailed Henderson, copying Plaintiff and another DOCCS

employee, and stating that he "received the summary of concerns" that were raised regarding the

MWAP Policy at a meeting on August 9, 2017 between Deputy Superintendents of Health and

Directors of Nursing. (Dkt. No. 93-4, at 51–52; Dkt. No. 92-8, ¶¶ 20, 30). Dinello added, "Let

me know when you are all available to meet and discuss the issues." (Dkt. No. 93-4, at 51–52).

Neither party has proffered an email reply.

On September 6, 2017, Plaintiff emailed Gonyea and Henderson about two patients

whose medication had been stopped, and further stated that an attorney had reached out to

another doctor "inquiring why medication recommended by a consultant was not being given."

(Dkt. No. 92-4, at 21–22). Plaintiff concluded, "I believe Dr. Dinello is trying to create statistics

that he can somehow use in his favor, all at the expense of practicing good medicine. This policy

created by Dr. Dinello has to stop before it creates bigger problems." (*Id.* at 22). That same day,

Gonyea forwarded Plaintiff's email to DOCCS Acting Commissioner Anthony Annucci,

Koenigsmann, and Associate Commissioner Kelly as an example of Gonyea's concerns about

"providing appropriate care and avoiding unnecessary legal issues." (*Id.* at 21). Gonyea asked

Dr. Koenigsmann to visit Walsh to meet with the doctors and see the operation of the RMU.
(*Id.*). Later that day, Koenigsmann replied just to Gonyea and copied Dinello, stating "I am
aware of the issues and concerns raised by your provider staff. I am also aware that Dr. Salvana
has refused to speak to Dr. Dinello regarding his cases and MWAP process. I think that is the
area that needs to be addressed first and foremost." (*Id.*). Dinello responded that day to
Koenigsmann and Gonyea, stating that Dinello "personally went to Mohawk CF." (*Id.* at 20).
Dinello stated that the first patient in Plaintiff's email is "stable" and that the second patient
"should be able to return to Mohawk CF without a problem." (*Id.*). Dinello noted that he asked
for the letter from the lawyer, and emphasized that he had "no ulterior motive regarding
MWAP"; "that the MWAP Policy was not created to disrespect [Plaintiff] or any other
provider"; and that he was "always available for discussion" and "more than happy to see the
patients in person when necessary." (*Id.*).

On October 26, 2017, Plaintiff sent a letter via email from his DOCCS email account to
Koenigsmann, Gonyea, Henderson, Tousignant, and two other people within DOCCS. (Dkt. No.
93-4, at 54). The letter, addressed to Koenigsmann, detailed medical issues concerning seven
patient cases who had medicine denied. (*Id.* at 55-56). Salvana stated:

> I am contacting you before your planned visit on November 1, to
> let you know that the MWAP Policy at Mohawk and Walsh RMU
> continues to create significant problems in the management of our
> patients and in administering proper community standards of care.
> . . . It has been and continues to be very demeaning to continually
> have to request MWAP drugs only to have Dr. Dinello deny them.
> . . . There are many other examples and the denial of medication to
> treat pain in these patients violates the community standard of care.
> If you disagree with this then perhaps we can consult an outside
> agency, who could reassure us that we are giving proper care.

(*Id.*). Later that day, Henderson sent Plaintiff an email, copying Gonyea, informing Plaintiff that
his correspondence was "totally inappropriate" and "[q]uite frankly, embarrassing" and that

Plaintiff should have sent the letter to Mohawk Superintendent Gonyea first for approval. (Dkt. No. 92-2, at 9). In her declaration, Henderson explains that Plaintiff's letter "was not against policy" but that it "undermin[ed] Gonyea's efforts to address Plaintiff's concerns about the MWAP policy" "given [the] tone." (Dkt. No. 92-1, ¶ 37). Henderson further explains that she sent the email to Plaintiff at Gonyea's direction, and that Gonyea was upset because he had previously instructed Plaintiff to obtain his review and approval on any correspondence to Koenigsmann. (*Id.* ¶¶ 38–39).[6]

On October 27, Koenigsmann responded, copying *inter alia* Dinello, Gonyea, and Associate Commissioner Kelly, thanking Plaintiff for the update and stating,

> [W]e are coming to the facility to . . . have an opportunity to speak to you and the providers regarding the MWAP program and your concerns on Wed 11/1. Dr. Dinello will be attending. I look forward to hearing your concerns and opening a dialog with Dr. Dinello. The meeting on Wed is not appropriate for specific patient issues[,] rather a more general discussion regarding the MWAP policy.

(Dkt. No. 92-4, at 24). Later that day, Gonyea emailed Koenigsmann directly apologizing that Plaintiff sent the letter; Gonyea said that Plaintiff "was told by Acting DSH Henderson not to send you any further e mails on this subject unless I approved them. We will be dealing with him on that matter." (*Id.*).

---

[6] Plaintiff has asserted that Henderson's statements are inadmissible hearsay not supported by the record. (Dkt. No. 99-1, ¶¶ 80–81). The Court notes that Plaintiff's first email, on July 7, 2017, was to Koenigsmann and nothing in the record suggests that Plaintiff was criticized or warned against emailing Koenigsmann at that time. However, according to Henderson, Gonyea asked Henderson to direct Plaintiff to obtain approval before submitting any additional complaints on or about October of 2017 because Gonyea was attempting to address issued raised by Plaintiff with DOCCS administrators in Albany. (Dkt. No. 92-1, ¶¶ 34–35). Gonyea himself told Koenigsmann in an email on October 27, 2017 that Henderson had instructed Plaintiff not to send further emails to Koenigsmann unless Gonyea approved them. (Dkt. No. 92-4, at 24). Because it appears that Henderson's statements could "be presented in a form that would be admissible in evidence," the Court can consider them on summary judgment. Fed R. Civ. P. 56(c)(2); *see also Figueroa v. Mazza*, 825 F.3d 89, 98 n.8 (2d Cir. 2016) ("[A]ny evidence considered on summary judgment must be reducible to admissible form.").

On November 1, 2017, Plaintiff participated in the November 2017 site visit with Koenigsmann and Dinello to discuss Plaintiff's concerns with the MWAP Policy. (Dkt. No. 98-2, ¶ 54). Plaintiff states that despite Koenigsmann's contention that the meeting was not an appropriate forum to discuss specific patients, Plaintiff did discuss the patients identified in the letter in the meeting as well. (Dkt. No. 93-4, ¶ 25). No immediate changes were made to the MWAP Policy after the meeting. (Dkt. No. 98-2, ¶ 56).

On December 26, 2017, Dinello emailed Walsh RMU providers, including Plaintiff, explaining that he recently visited the Walsh RMU and found that the MWAP Policy was not being followed. (Dkt. No. 92-4, at 29). Dinello reminded the providers of the need to comply with the terms of the MWAP Policy and labelled his email an "informal warning." (*Id.*). On or about January 18, 2018, Dinello, Koenigsmann, and Salvana participated in a conference regarding Salvana's MWAP Policy concerns. (Dkt. No. 92-8, ¶ 98). As a result of the conference, Salvana and Dinello reached a compromise about implementation of the MWAP Policy at Walsh RMU, which was memorialized in an email sent by Plaintiff, dated January 19, 2018. (*Id.* ¶¶ 99–100).

### D.    Enforcement of the Policy

After an incident in June 2019 where Salvana and Henderson disagreed about providing an MWAP medication to a patient, Salvana wrote a memorandum detailing his version of the events. (Dkt. No. 98-2, ¶¶ 63–70). Plaintiff contends that in response to his report, Henderson locked him out of the facility and demanded he go to her office. (*Id.* ¶ 71). In her office, Plaintiff alleges that she berated him for using an MWAP medication and filing a complaint about her. (*Id.* ¶ 72). Defendants deny the lock-out allegations and Plaintiff's characterization of the meeting. (*Id.* ¶¶ 71–72). According to Defendants, Mohawk Superintendent John C. Harper (who had replaced Gonyea) requested a meeting with Henderson and Salvana, where he raised

10

concerns that Salvana had been behaving disrespectfully towards Henderson. (Dkt. No. 92-8, ¶¶ 101–02). According to Defendants, Plaintiff subsequently chose to go to his vehicle to reflect on his conduct. (*Id.* ¶ 104). Defendants state that Plaintiff was not locked out of the facility and returned to Walsh RMU later that day to continue with his work duties. (*Id.* ¶¶ 105–08).

Plaintiff further alleges that Henderson and Nurse Director Betty Parkmond ordered nurses to withhold assistance from him for several of his patients. (Dkt. No. 98-2, ¶ 74). Plaintiff contends that the nurses complied with those orders and that he documented these events in a September 30, 2019 letter. (*Id.*). Defendants deny these allegations, and instead claim that Parkmond gave specific instructions to the nursing staff, following an incident, not to assist Plaintiff "in allowing incarcerated individuals to use sharps or needles, or to administer their own medication intravenously" for the purposes of "preventing nursing staff from violating clear directives and policy prohibiting such conduct." (Dkt. No. 92-8, ¶¶ 148–59). Defendants allege that Parkmond did not otherwise direct any nursing staff to withhold assistance from Plaintiff with any otherwise appropriate task. (*Id.* ¶ 160).

### E.     Plaintiff's Departure from Walsh RMU

On or about September 2019, Defendants contend that Plaintiff, on his own accord, contacted Dinello asking for assistance in transferring out of Walsh RMU to another facility. (*Id.* ¶ 166, Dkt. No. 98-2, ¶ 79). Plaintiff contends, however, that he was "removed and forced to leave Walsh RMU" to "escape an environment that needlessly prolonged patient suffering and retaliated against him for trying to prevent it." (Dkt. No. 94, ¶ 79). Plaintiff refers to an email Dinello sent to John Morley, the then Deputy Commissioner and Chief Medical Officer for DOCCS, about a year after the transfer stating that "Dr. Salvana was 'removed' from the Walsh RMU." (*Id.* ¶ 80, Dkt. No. 93-23, at 2; Dkt. No. 92-8, ¶ 3).

Dinello arranged for Plaintiff to obtain a physician position at Five Points Correctional Facility, in Romulus, New York, which Plaintiff opted not to accept. (Dkt. No. 92-8, ¶¶ 169–70). Dinello then assisted Plaintiff in obtaining a part-time physician position at Southport Correctional Facility, in Southport, New York, a facility which was over two hours away from Plaintiff's home. (*Id.* ¶ 171; Dkt. No. 94, ¶ 82). According to Defendants, Plaintiff chose to accept the position, (Dkt. No. 92-8, ¶ 172), but according to Plaintiff, he was "forced" to take the position. (Dkt. No. 94, ¶ 82).

After his transfer to Southport, Plaintiff subsequently contacted Dinello and Morley about his interest in a Clinical Physician position at Cayuga Correctional Facility that would be open upon the expected retirement of a physician employed at that facility. (Dkt. No. 92-8, ¶¶ 191, 202). Plaintiff completed and filed the necessary paperwork seeking the transfer. (Dkt. No. 94, ¶ 84). Defendants contend that Dinello supported Plaintiff's decision, but made no promises as to whether a physician position would be made available to him. (Dkt. No. 92-8, ¶¶ 192–93). According to Defendants, upon the retirement of the Cayuga physician, the medical staff at Cayuga voiced their preference that the position be switched to a nurse practitioner position to allow a nurse practitioner then employed at Cayuga part-time to work at the facility full-time. (*Id.* ¶ 196). Defendants contend that Dinello did not see a reason to overrule the preference expressed by the medical staff at Cayuga, and so he did not object and instead notified Plaintiff of the change. (*Id.* ¶¶ 197–98). Defendants contend that Morley deferred to Cayuga facility administrators and Dinello about converting the position, and approved the position change based on the facility's request. (*Id.* ¶¶ 204, 206–08). According to Defendants, because there was no longer an open physician position, Plaintiff was not eligible to transfer. (*Id.* ¶ 206).

Plaintiff contends, on the other hand, that Dinello, Henderson, and Morley conspired to prevent his transfer by deliberately changing the position from a physician to a nurse practitioner, that Dinello had the authority to transfer him, and that there was an open physician position from the time the physician retired in February 2020 until another doctor was hired because the new nurse practitioner position did not result in the replacement of a physician. (Dkt. No. 99-1, ¶¶ 192–201; Dkt. No. 94, ¶ 89). In support of Plaintiff's contentions, Plaintiff cites to a statement Dinello made in his deposition that "I could've gotten him that job if he really wanted, if it was a good fit." (Dkt. No. 99-1, ¶ 197 (quoting Dkt. No. 93-11, at 272)). Plaintiff further offers that Dinello sent an email to the Cayuga Superintendent stating:

> I have a Physician by the name of Michael Salvana MD who would like to take over [the] Clinical Physician 2 position . . . Unfortunately there have been a few issues with his employment . . . I would actually like to change [the] Full Time Clinical Physician 2 Item into a Family or Adult [Nurse Practitioner] Item. . . . If we Post the Clinical Physician 2 Item, Dr. Salvana will ask to transfer into the Position and I don't believe we will find a local Physician willing to take the position. I think it would be best to just change the Item.

(Dkt. No. 94, ¶ 90; Dkt. No. 93-30, at 2–3).

Plaintiff alleges that his four-hour per day commute to Southport was untenable, and so he was "forced to resign," which according to Plaintiff, meant that "Dr. Dinello successfully forced him out of DOCCS." (Dkt. No. 94, ¶¶ 91–92). Plaintiff retired from state service in April 2020 because there was no viable physician position available. (*Id.* ¶ 93). A physician was hired at Cayuga in October 2020. (*Id.* ¶ 94).

## III.     THE MOTIONS FOR SUMMARY JUDGMENT

### A.     Standard of Review

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all submissions taken together "show that there is no genuine issue as to any material fact and

that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*, 477 U.S. at 248).

Where, as here, both parties have filed motions for summary judgment, "the court must evaluate each party's motion on its own merits." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) (quoting *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323. The moving party may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322; *see also Selevan v. N.Y. Thruway Auth.*, 711 F.3d 253, 256 (2d Cir. 2013) (explaining that summary judgment is appropriate where the nonmoving party fails to "'come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on' an essential element of a claim" (quoting *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010))). If the moving party meets this burden, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323–24; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). In ruling on a motion for summary judgment, "[t]he role of the court is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." *Brod v.*

*Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011) (quoting *Wilson v. Nw. Mut. Ins. Co.*, 625 F.3d 54, 60 (2d Cir. 2010)).

"When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003). Still, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (citing *Quarles v. Gen. Motors Corp.*, 758 F.2d 839, 840 (2d Cir. 1985)). Furthermore, "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).

### B.    Discussion

#### 1.    First Amendment Retaliation

To establish First Amendment retaliation, "the plaintiff must demonstrate that '(1) his or her speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him or her; and (3) there was a causal connection between this adverse action and the protected speech.'" *Agosto v. N.Y. City Dep't of Educ.*, 982 F.3d 86, 94 (2d Cir. 2020) (quoting *Montero v. City of Yonkers*, 890 F.3d 386, 394 (2d Cir. 2018)). Both parties argue that summary judgment is warranted on the question of whether Plaintiff engaged in speech protected under the First Amendment. (Dkt. No. 92-9, at 7–10; Dkt. No. 93-34, at 11–16).

### a.    Protected Speech

"The speech of a public employee is protected by the First Amendment when the employee speaks as a citizen on a matter of public concern, rather than pursuant to his employment responsibilities." *Specht v. City of New York*, 15 F.4th 594, 600 (2d Cir. 2021) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 420–21 (2006)). Thus, as a public employee, Plaintiff must demonstrate that he "engaged in citizen speech," in other words, that he "spoke as a private citizen," and that "the speech at issue was on a matter of public concern." *See Montero*, 890 F.3d at 399; *Matthews v. City of New York*, 779 F.3d 167, 172 (2d Cir. 2015).

### i.    Matter of Public Concern

"Whether speech is on a matter of public concern presents a question of law that takes into consideration the content, form, and context of a given statement." *Specht*, 15 F.4th at 600 (citing *Montero*, 890 F.3d at 399). "Speech deals with matters of public concern when it can be fairly considered as relating to matters of political, social, or general interest to the community or value and concern to the public." *Id.* (citing *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). As the Second Circuit has explained:

> To identify matters of public concern, "we consider the motive of the speaker, cognizant that speech on a purely private matter does not pertain to a matter of public concern and, conversely, that an individual motivated by a personal grievance can simultaneously speak on a matter affecting the public at large[.]"

*Id.* (quoting *Golodner v. Berliner*, 770 F.3d 196, 203 (2d Cir. 2014)).

Defendants seemingly argue that Plaintiff's speech was not made on a matter of public concern, because his statements were matters only of personal interest relating to internal policies and should be viewed as personal employee grievances. (Dkt. No. 92-9, at 7). Defendants assert that Plaintiff's complaints "focused on the fact that Plaintiff thought it was demeaning to him professionally that he was required to seek approval from Dinello for the use

of MWAP medications and that he disagreed with Dinello's denials." (Dkt. No. 92-8, ¶ 72). Plaintiff argues that his speech was on a matter of public concern, because it pertained to patient suffering, the standard of care, and potential litigation and ethics complaints. (Dkt. No. 99, at 11). The Court agrees.

Although some of Salvana's complaints included statements describing the demeaning effects of the MWAP policy as implemented by Defendant Dinello, (Dkt. No. 93-4, at 48–49, 55), Plaintiff's speech clearly extended beyond personal grievances and interests to focus on patient care. Speech implicating "the health, welfare and safety of severely disabled individuals in the care of the state[ ] are matters of importance to the public." *McLaughlin v. Pezzolla*, No. 06-cv-376, 2010 WL 56051, at *9, 2010 U.S. Dist. LEXIS 232, at *30 (N.D.N.Y. Jan. 4, 2010). Here, Plaintiff's speech about the health of inmates in the care of the state who had some of the "most complicated and difficult [medical] cases" was a matter of public concern. (Dkt. No. 94, ¶ 11); *see Dillon v. Suffolk County Dep't of Health Servs.*, 917 F. Supp. 2d 196, 208 (E.D.N.Y. 2013) (finding complaints by a doctor at a correctional facility that *inter alia* necessary medications were not being prescribed to be matters of importance to the public because they implicated the health, welfare and safety of individuals in the care of the state). Plaintiff's "concern for his patients' well-being and for the general workings of the [Walsh RMU]" based on his "concern as a professional" was therefore a matter of public concern. *DiMarco v. Rome Hosp.*, No. 88-cv-1258, 1991 WL 336000, at *1, 8, 1991 U.S. Dist. LEXIS 16603, at *3, 24–25 (N.D.N.Y. June 29, 1991) (finding complaints raising "questions about . . . the professional conduct and medical judgment of several of his colleagues and the nursing staff, the Hospital's overall patterns and practices, and the leadership and competence of those individuals who were responsible for managing the Hospital" to be matters of public concern).

### ii.     Speaking as a Private Citizen

When determining whether a public employee spoke as a private citizen, courts ask two questions: "(A) did the speech fall outside of the employee's 'official responsibilities,' and (B) does a civilian analogue exist?" *Matthews*, 779 F.3d at 173 (citing *Weintraub v. Bd. of Educ. of City Sch. Dist. of City of N.Y.*, 593 F.3d 196, 203–04 (2d Cir. 2010)). Within this inquiry, "[a]lthough the presence or lack of a civilian analogue may be of some help in determining whether one spoke as a citizen, '[t]he critical question . . . is whether the speech at issue is itself ordinarily within the scope of an employee's duties.'" *Montero*, 890 F.3d at 397–98 (quoting *Lane v. Franks*, 573 U.S. 228, 240 (2014)). Defendants argue that Plaintiff's speech fell squarely within his official responsibilities and that he has failed to allege a civilian analogue. (Dkt. No. 92-9, at 8). Plaintiff, on the other hand, argues that he was speaking as a private citizen. (Dkt. No. 93-34, at 15).

### (i)  Official Responsibilities

Courts have adopted a "functional approach" to assessing whether speech falls outside of an employee's official responsibilities, focusing on the employee's "actual, functional job responsibilities." See *Matthews*, 779 F.3d at 173–74. Because of the fact-intensive nature of this inquiry, it is not subject to a bright-line rule: courts look to "the nature of the plaintiff's job responsibilities, the nature of the speech, and the relationship between the two." *Id.* at 173 (quoting *Ross v. Breslin*, 693 F.3d 300, 306 (2d Cir. 2012)). Under this functional approach, formal job descriptions are relevant but not dispositive, because:

> Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti*, 547 U.S. at 424–25. In addition to a plaintiff's job description, courts have considered "the persons to whom the speech was directed," "whether the speech resulted from special knowledge gained through the plaintiff's employment," "whether the speech occurs in the workplace"; and "whether the speech concerns the subject matter of the employee's job." *Frisenda v. Inc. Vill. Of Malverne*, 775 F. Supp. 2d 486, 506 (E.D.N.Y. 2011) (citation omitted).

Here, the parties dispute Plaintiff's official duties. Henderson provided a declaration stating that Plaintiff was charged with, *inter alia*, "the coordination and direction of treatment at Walsh RMU; the provision and supervision of treatment to incarcerated individuals under the care of the Walsh RMU; the review of program standards and objectives to determine their appropriateness; and the general development, implementation and administration of services at the Walsh RMU." (Dkt. No. 92-1, ¶ 13). She further stated that "[i]t was within the responsibilities of his official position to weigh in on all aspects of provision of treatment to his patients, which included comments or concerns raised by implementation of policies by DOCCS medical staff." (*Id.* ¶ 14). In Plaintiff's 2018 and 2019 evaluations, Henderson "encouraged [Plaintiff] to continue evaluating and discussing medical care with his superiors" and praised his "initiative to advocate for health services staff and Walsh RMU admitted inmate-patients." (Dkt. No. 98-2, ¶ 20; Dkt. No. 93-4, at 35, 40). In his declaration Dinello stated that "[a]lthough [Plaintiff] was not technically charged with the creation and review of policy, he, as well as other medical directors, was encouraged and, indeed, expected to comment on or raise to administrators issues affecting patient care, including policies and procedures." (Dkt. No. 92-3, ¶ 34).

Plaintiff, however, denies that it was part of his duties "to comment or raise concerns about the implementation of DOCCS' policies" and refers the Court to his Description of

Activities and Tasks under the Title Clinical Physician 3 for a list of official duties. (Dkt. No. 99-1, ¶¶ 65–67). Under this description, prepared by Plaintiff's supervisor, twenty-five percent of his time was spent "[e]nsur[ing] high quality inmate health care by evaluating and discussing the medical care provided . . ." (Dkt. 93-32, at 2). His remaining responsibilities were (2) "[m]aintains professional relationships within the facility and outside in the community," (3) "[a]rranges on-call coverage," (4) "[e]ncourages staff growth through the promotion of in-service education," (5) "[e]valuates employee performance," (6) "[c]ompletes grievances and inmate correspondence investigations and submits appropriate documentation in a timely manner," and (7) "[e]valuate eligibility of inmates for medical parole and Full Board Case Review." (*Id.*). In Plaintiff's deposition, he testified that his primary job duties were to evaluate and supervise the other doctors and nurse practitioners. (Dkt. No. 93-2, at 72). He also testified that although the prior Medical Director did not take patients, Plaintiff decided to do so and managed the care of the twenty or thirty sickest patients. (*Id.* at 73).

In any event, courts are to use a "functional approach" in evaluating an employee's job duties. *Matthews*, 779 F.3d at 173; *Weintraub*, 593 F.3d at 203. The Second Circuit has held that speech is pursuant to a public employee's official job duties "even though it is not required by, or included in, the employee's job description" if the speech is "part-and-parcel of his concerns" about his ability to "properly execute his duties." *Weintraub*, 593 F.3d at 203 (quoting *Williams v. Dallas Indep. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007)) (finding that the public-school teacher's concerns about maintaining classroom discipline, an "indispensable prerequisite to effective teaching," were "part-and-parcel of his concerns" about his ability to "properly execute his duties" and were therefore, unprotected). In *Matthews*, the Second Circuit held that a police officer's complaints to precinct commanding officers about a precinct-wide quota system were

20

not "'part-and-parcel' of his regular job," and were therefore protected. 779 F.3d at 174. There, the court found that the officer's duties did not involve formulating, implementing, or providing feedback on the policy, because such policy-oriented speech was "neither part of his job description nor part of the practical reality of his everyday work"; his job did not involve reporting misconduct or commenting on precinct-wide policy, and he had "no role in setting policy" nor was he "expected to speak on policy" or "consulted on formulating policy." *Id.* The Second Circuit subsequently reaffirmed that "[u]ltimately, the question, then is whether the employee's speech was 'part-and-parcel of [that person's] concerns about his ability to execute his duties.'" *Montero*, 890 F.3d at 398 (quoting *Weintraub*, 593 F.3d at 203) (second alteration in original). In *Montero*, the court found that a police officer's complaints at union meetings qualified as citizen speech because they were made pursuant to the plaintiff's union role and not "as a 'means to fulfill' or 'undertaken in the course of performing' his responsibilities as a police officer." *Id.* at 398–99 (quoting *Weintraub*, 593 F.3d at 203).

Here, the Court finds that like *Weintraub*, Plaintiff's concerns about the MWAP Policy were "part-and-parcel of his concerns" about his ability to properly execute his duties as Medical Director, and that Plaintiff's concerns about the policy's implementation were indispensable to his core duty of "[e]nsur[ing] high quality inmate health care." *See* 593 F.3d at 203; (Dkt. No. 93-32, at 2). His complaints were "means to fulfill" this duty and undertaken in the course of performing his responsibilities. *Weintraub*, 593 F.3d at 203. Although Plaintiff argues that the policy "had no impact on [his] core job functions" and that he was nevertheless able to "fulfill his job duties of evaluating and treating patients," (Dkt. No. 93-34, at 15), it is well-documented that the policy had significant impacts on Plaintiff's ability to treat patients as he saw fit, (*see, e.g.*, Dkt. No. 94, ¶¶ 62–73). That Plaintiff's communications or concerns with the MWAP

21

Policy were part and parcel of his ability to do his job is also supported by the fact that "[a] few" other providers raised similar communications or concerns. (Dkt. No. 93-11, at 202).

Thus, while Plaintiff's job description did not include formulating, implementing, or providing feedback on DOCCS policies, here unlike in *Matthews*, Plaintiff's speech concerned a policy that interfered with his ability to do his job – i.e. to provide quality patient care, and following Plaintiff's complaints, DOCCS officials responded to and were engaged in considering the policy's impact on patient care. Plaintiff's involvement in policy was evidenced by the compromise reached by Plaintiff and Dinello after the January 2018 conference with respect to MWAP implementation at Walsh RMU. (Dkt. No. 92-8, ¶¶ 98–99). Furthermore, Plaintiff's speech was only made internally within DOCCS, was sent through DOCCS platforms, and raised issues that Plaintiff only came to learn as part of his duties and responsibilities as Medical Director. *See Frisenda*, 775 F. Supp. 2d at 506–07 (finding that these factors, among others, rendered the plaintiff's speech unprotected).

That Plaintiff complained to higher levels of supervision beyond his direct supervisor does not alter the analysis: his complaints stayed within the chain-of-command, and were sent to those responsible for ultimately ensuring that incarcerated individuals in DOCCS custody received proper medical care. *See id.* at 508–09. The fact that Henderson admonished Plaintiff regarding his October letter to Koenigsmann, (Dkt. No. 92-2, at 9), and Gonyea apologized to Koenigsmann about Plaintiff's letter, (Dkt. No. 92-4, at 24), does not change the Court's view that Plaintiff was speaking as part of his public job and not as a citizen. Plaintiff sent his first documented complaint, on July 7, 2017, to Koenigsmann, and Koenigsmann responded directly to Plaintiff. (Dkt. No. 93-19, at 2). The fact that Plaintiff's supervisor at Mohawk directed Plaintiff not to speak directly with Koenigsmann after Superintendent Gonyea himself got

actively involved by raising Plaintiff's complaint to the level of an Associate Commissioner of DOCCS does not change the fact that Plaintiff's complaints were part-and-parcel of his concerns about his ability to properly do his job. Plaintiff sent the October letter to Koenigsmann before the planned visit and Koenigsmann and Dinello met with Plaintiff shortly thereafter at an official site visit to have "a general discussion regarding the MWAP policy." (Dkt. No. 93-4, at 54).Thus, while breaking the chain-of-command may, in some instances, evince that a plaintiff is not speaking pursuant to his duties, *see Pisano v. Mancone*, No. 08-cv-1045, 2011 WL 1097554, at *11, 2011 U.S. Dist. LEXIS 28864, at *37 (S.D.N.Y. Mar. 18, 2011), it does not do so here, where Plaintiff had been and continued to be engaged in communications with Koenigsmann regarding the MWAP policy. C*f. Gusler v. City of Long Beach*, No. 10-cv-2077, 2016 WL 11493644, at *19, 2016 U.S. Dist. LEXIS 206864, at *56 (E.D.N.Y. Aug. 4, 2016) (finding that plaintiff, at least theoretically, spoke as a citizen when he had been instructed not to comment on matters of policy or misconduct by his superiors and commented anyway).

### (i) Civilian Analogue

"Speech has a 'relevant civilian analogue' if it is made through 'channels available to citizens generally.'" *Matthews*, 779 F.3d at 175 (quoting *Jackler v. Byrne*, 658 F.3d 225, 238 (2d Cir. 2011)). In *Matthews*, the Second Circuit found that a police officer's speech had a civilian analogue when, rather than going through formal internal grievance procedures, he "went directly to the Precinct commanders, with whom he did not have regular interactions and who had an open door to community comments and complaints." *Id.* at 176. The Court noted that these Precinct commanders attended monthly Community Council meetings, met with members of the community, and "regularly heard civilian complaints about Precinct policing issues." *Id.*; *see also Schoolcraft v. City of New York*, 103 F. Supp. 3d 465, 509–10 (S.D.N.Y. 2015) (finding

on summary judgment that an NYPD officer's speech had a civilian analogue when he spoke at a performance evaluation and appeal meeting, but also with the Internal Affairs Bureau and Quality Assurance Division, noting that any citizen can report wrongdoing to the IAB, and that it was not clear from the record whether the public can report to the QAD, which would "remain a question for trial"); *cf. Weintraub*, 593 F.3d at 204 (finding a teacher's speech was not protected when he lodged a union grievance, which is not a channel available to non-employees).

Here, Plaintiff emailed, wrote letters to, and met with various DOCCS officials, including Superintendent Gonyea, RMD Dinello, and Chief Medical Officer Koenigsmann. (Dkt. No. 94, ¶¶ 47–50, 54). The record is devoid of any evidence of whether members of the public could engage in these methods of communications with DOCCS officials, but Gonyea, Dinello and Koenigsmann were within Plaintiff's chain of command. (*Id.* ¶¶ 25 (explaining that Dr. Dinello was Plaintiff's immediate supervisor), 26 (explaining that Dr. Dinello reported directly to the CMO); Dkt. No. 92-8, ¶ 18 (explaining that Plaintiff also reported to administrators at Mohawk, including Gonyea as the facility superintendent)). Plaintiff asserts that citizens could write to and have conversations with DOCCS officials, (Dkt. No. 93-34 at 15 n.9), but there is no evidence that these officials consider complaints from private citizens. Plaintiff also cites to the DOCCS' grievance procedures for incarcerated individuals, (*id.*),[7] but complaints submitted though the grievance process lack a relevant civilian analogue as they are "internal communication[s] pursuant to an existing dispute-resolution policy" and are therefore not made "through channels available to citizens generally." *Weintraub*, 593 F.3d at 204 (finding that the plaintiff's union grievance filing lacked a relevant civilian analogue).

---

[7] In his reply brief, Plaintiff cites to Paragraph 32 of his Statement of Material Facts, (Dkt. No. 99, at 12), which sets forth the DOCCS grievance process and cites to DOCCS Directive No. 4040, (Dkt. No. 94, ¶ 32 & n.41). DOCCS Directive 4040 is entitled "Incarcerated Grievance Program" and its purpose is to resolve grievances by incarcerated individuals. (Dkt. No. 93-16).

Without evidence that these officials took public concerns and given that they were within Plaintiff's chain of command, the Court finds that there is no civilian analogue for Plaintiff's speech. *See Ross*, 693 F.3d at 307 ("Taking a complaint up the chain of command to find someone who will take it seriously 'does not, without more, transform [his] speech into protected speech made as a private citizen.'" (quoting *Anemone v. Metro. Transp. Auth.*, 629 F.3d 97, 116 (2d Cir. 2011))); *Calvelos v. City of New York*, No. 19-cv-6629, 2020 WL 3414886, at *14, 2020 U.S. Dist. LEXIS 109266, at *40 (S.D.N.Y. June 22, 2020) (finding that "intra-facility complaints to the command staff" by a corrections officer lacked a civilian analogue); *Flynn v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 17-cv-2864, 2018 WL 2041713, at *6, 2018 U.S. Dist. LEXIS 72277, at *15–16 (S.D.N.Y. Apr. 30, 2018) (rejecting plaintiff's argument that her complaints were "outside the chain of command" because the official she complained to was "several levels above [her] at DOCCS," because the official did not "entertain[] complaints from private citizens"). Although "the lack of a civilian analogue [i]s not critical to a decision as to whether [Plaintiff] spoke as a private citizen," it supports the Court's finding that the speech at issue was within the scope of Plaintiff's duties. *See Montero*, 890 F.3d at 398.

Therefore, after carefully considering all of the evidence, the Court finds that the Plaintiff was speaking as a public employee, and not a citizen. Accordingly, "no First Amendment claim arises, and that ends the matter." *Caraccilo v. Vill. of Seneca Falls*, 582 F. Supp. 2d 390, 405 (W.D.N.Y. 2008).[8] Thus, the Court grants Defendants' motion for summary judgment and denies Plaintiff's motion for summary judgment.

---

[8] Accordingly, the Court does not evaluate the parties' arguments about whether Plaintiff suffered an adverse employment action causally related to his speech, nor does the Court consider Defendants' arguments regarding the statute of limitations, appropriateness of injunctive or prospective relief, or qualified immunity.

IV.    **CONCLUSION**

For these reasons, it is hereby

**ORDERED** that Plaintiff's motion for summary judgment (Dkt. No. 93) is **DENIED**;

and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 92) is

**GRANTED** and Plaintiff's amended complaint (Dkt. No. 38) is **DISMISSED**; and it is further

**ORDERED** that the Clerk is directed to close this case.

**IT IS SO ORDERED.**

Dated:  March 6, 2025
        Syracuse, New York

Brenda K. Sannes
Chief U.S. District Judge